[Crim. No. 11954. Fourth Dist., Div. One. Dec. 18, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
THEODORE PATRICK, Defendant and Appellant.

Counsel

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Charles M. Sevilla, Chief Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Bernard A. Delaney, Jr., and Robert M. Foster, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

**WIENER, Acting P. J.**—Defendant Theodore Patrick appeals from a judgment of conviction on counts of kidnaping (Pen. Code, § 207), false imprisonment (Pen. Code, §§ 236 and 237), and conspiracy to commit both acts (Pen. Code, § 182). The facts of the case involve the emotionally charged issue of deprogramming suspected "cult" members, a field in which Patrick has become nationally if not internationally renowned during the last decade. With perhaps one exception, however, the legal issues presented here do not evoke the same intensity of emotional response as does Patrick's vocation in the eyes of his proponents and detractors. Reviewing those issues in an objective fashion, we have concluded that while the convictions for false imprisonment and conspiracy to falsely imprison should be stricken, the judgment, insofar as it relates to kidnaping and conspiracy to kidnap, must be affirmed.

*Factual and Procedural Background*

In 1973, a Maryland family named McElfish concluded their 19-year-old daughter Roberta had become a member of a dangerous religious cult referred to as the Thomas Family.[1] The concerned relatives included Roberta's father Bobby, her mother Rosemary, and two sisters, Mary Cecilia and Marye Rita. An investigation of the Thomas Family and its living conditions did nothing to allay the McElfishes' fears. As a result, they attempted an unsuccessful abduction of Roberta

---

[1]Throughout the trial, Roberta steadfastly denied membership in or allegiance to any "cult." She maintained she was a practicing Roman Catholic.

in 1975 [2] Following that attempt, the Thomas Family disappeared from Maryland. During the next four years, the McElfishes sought to locate Roberta and contacted numerous government and law enforcement agencies to ascertain what could be done about their daughter's involvement in a religious cult. They consistently received a negative response.

In 1979, the McElfishes located Roberta and her young son Shad in Tucson, Arizona. During a visit by Bobby and Marye Rita in June, Roberta convinced them she was not a member of a cult. The McElfishes returned to Maryland, but later concluded they had been deceived. They then began planning to abduct Roberta in order to deprogram her.

In October, Mary Cecilia telephoned Ted Patrick's secretary, Sondra Sacks, in San Diego and related their story regarding Roberta. She indicated the McElfish family wanted to hire Patrick to deprogram Roberta. Sacks informed Mary Cecilia she would pass the request on to Patrick who would contact the McElfishes at a later date.

During the next several months, Mary Cecilia had several conversations with both Patrick and Sacks which culminated in a generalized agreement that Patrick would deprogram Roberta for a fee of $7,500. The plan called for the McElfish family to abduct Roberta and bring her to the home of a relative in Charleston, South Carolina. Patrick was to meet the family there to begin the deprogramming.

On March 25, 1980, the McElfish family arrived in Tucson. Mary Cecilia phoned Patrick to announce the family's arrival. She explained that everyone was tired from the trip and inquired whether a site closer than South Carolina could be arranged for the deprogramming. Patrick responded that he would arrange for a new location after his fee had been received.

A cashier's check for $7,500 was obtained and mailed to Patrick on March 26. On March 27, Mary Cecilia again spoke with Patrick. He first inquired whether they needed "help" in the abduction attempt.[3]

---

[2] The abduction attempt was successful in removing Roberta's husband David Hamilton and their four-year-old daughter Melissa from the Thomas family. David decided not to return to the group but Roberta, then caring for the couple's younger son Shad, determined to stay.

[3] During an earlier phone call with Marye Rita, Patrick had offered to provide two "snatch men" to abduct Roberta at a price of $1,200.

Mary Cecilia declined the offer. Patrick indicated the best way to complete a successful kidnaping was to come from behind, making sure the victim's hands were down at her sides. He also instructed that the abduction should be completed within 10 seconds in order to avoid attention. Patrick then stated he had arranged for a deprogramming site in Mt. Vernon, Washington. He instructed the McElfish family to drive to Seattle and then take Interstate 5 north to Mt. Vernon. A phone call was to be placed with the caller using the code words "Black Lightning."[4] Instructions would then be provided as to where to take Roberta for the deprogramming.

The McElfish family arranged to meet Roberta and Shad for dinner on March 27. Following dinner as they were leaving the restaurant, Roberta was grabbed from behind by her father and John Zombro, Marye Rita's fiance who had accompanied the family from Maryland. She was forced into the back of a waiting station wagon with her hands and feet taped and driven to a Ramada Inn in Phoenix by Zombro and Bobby McElfish. The female family members (Rosemary, Mary Cecilia and Marye Rita) remained in Tucson in an attempt to obtain custody of Shad.

It is at this point the story begins to get complicated. The scuffle at the restaurant apparently attracted some attention and Tucson police were called. They detained and questioned the three females. Shad was placed with a child protection service while the situation was being straightened out. Phoenix police were also notified and arrived at the Ramada Inn shortly after John Zombro, Bobby McElfish and Roberta. Emotionally distraught, Bobby McElfish agreed to return his daughter to her home in Tucson. Roberta told the Phoenix police she did not wish to press charges. The three were then released and they drove back to Tucson that night.

Upon arriving in Tucson, Zombro ignored Roberta's requests and drove to a motel where Mary Cecilia was waiting. She got into the car, telling them "Black Lightning. On to destination." They then proceeded on to California. Mary Cecilia told Roberta they were taking her to be cured by a man named Patrick.

Roberta and her abductors arrived in El Centro, California, during the early morning hours of March 28. They stopped at a restaurant to

---

[4]Patrick had been referred to by the nickname "Black Lightning."

get something to eat. Mary Cecilia called Patrick from the restaurant. She told him where they were, related their experiences in Tucson, and asked if there was somewhere in San Diego where they could rest. Patrick gave them the address of a Ramada Inn in Chula Vista and instructed them to wait there for him to get in touch with them.

As the group was leaving the restaurant, Roberta grabbed onto two construction workers who were entering. She told them she was being kidnaped and asked their help. Although the family tried to convince the men Roberta was a member of a cult and was under the influence of some drug, they insisted on calling the police. When the police arrived, Zombro and the McElfishes were arrested and Roberta was released.

Marye Rita and Rosemary McElfish had remained in Tucson while the rest of the family drove Roberta toward El Centro. After learning of the arrests, Marye Rita and Rosemary also went to El Centro. Marye Rita arranged for the services of Robert Clark, a private investigator from Beverly Hills, to aid the family and help in recovering the $7,500 paid to Patrick.

Clark arrived in El Centro on Sunday night, March 29, and contacted the McElfishes in their hotel room. Patrick arrived shortly thereafter. He told the family not to give up hope; that there were attorneys available who could help them. Clark testified that Patrick also reoffered his "snatch men" for $1,200 (see fn. 3, *ante*), but both Mary Cecilia and Marye Rita denied Patrick made such a statement. Patrick then returned the $7,500 cashier's check and left.

Based on the foregoing events, charges were filed against both Patrick and his secretary Sondra Sacks. The charges against Sacks were dismissed after the trial court granted a Penal Code section 995 motion. As a result of an agreement reached with the San Diego County District Attorney, charges against the McElfishes were postponed pursuant to a diversion program in exchange for their testimony in the instant action. (See Pen. Code, § 1001 et seq.)

*Availability of the "Necessity" Defense*

■ Patrick's principal contention on appeal relates to the trial court's decision not to instruct the jury on the "necessity" defense whereby a defendant's violation of the law in an emergency context

may be excused if such illegal act is committed to avoid a greater harm. The trial court concluded that while such a defense may be applicable in some circumstances, Patrick's offer of proof failed to demonstrate a sufficient emergency to justify the McElfishes, and Patrick as their agent, in committing a kidnaping.

We may assume arguendo the necessity defense exists as a part of California criminal law. (See generally, Model Pen. Code (Proposed Official Draft 1969) § 3.02; 1 Witkin, Cal. Crimes (1963) Defenses, § 248; *People* v. *Lovercamp* (1974) 43 Cal.App.3d 823 [118 Cal.Rptr. 110, 69 A.L.R.3d 668].) Nonetheless we conclude the trial court did not err in finding Patrick's offer of proof deficient.[5] We base that conclusion on three separate factors.

First, although the exact confines of the necessity defense remain clouded, a well-established central element involves the emergency nature of the situation, i.e., the imminence of the greater harm which the illegal act seeks to prevent.[6] (See *State* v. *Johnson* (1971) 289 Minn. 196 [183 N.W.2d 541, 543, 45 A.L.R.3d 1432].) The commission of a crime cannot be countenanced where there exists the possibility of some alternate means to alleviate the threatened greater harm. (See LaFave & Scott, Criminal Law (1972) p. 387.) Here, virtually all of the McElfishes' information about the alleged cult was obtained four or five years before the kidnaping. The most recent contact by two of the family members with Roberta convinced them she was no longer a cult member. Moreover, there was no evidence suggesting any particular harm which was likely to befall Roberta in March 1980. After some seven years of alleged cult membership, any imminent harm threatening Roberta, if it existed at all, was of a character not justifying the violent action undertaken by the McElfishes with Patrick's help.[7]

---

[5] A trial court must instruct the jury on a requested defense where the defendant proffers "'evidence from which a jury composed of reasonable men'" could find the defense applicable. (*People* v. *Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1], quoting *People* v. *Carr* (1972) 8 Cal.3d 287, 294 [104 Cal.Rptr. 705, 502 P.2d 513].)

[6] Some formulations of the necessity defense specifically include an "imminence" requirement. (See, e.g., *People* v. *Lovercamp, supra*, 43 Cal.App.3d at p. 831.) In others, the immediacy of the danger becomes a factor in assessing the reasonableness of the actor's belief regarding the magnitude of the "greater harm" he seeks to prevent. (See, e.g., Model Pen. Code, *supra*, § 3.02.)

[7] Patrick suggests the imminence requirement should not be interpreted so as to penalize the McElfishes for the passage of time due to their lack of knowledge of

We acknowledge that "[d]oubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused." (*People* v. *Wilson* (1967) 66 Cal.2d 749, 763 [59 Cal.Rptr. 156, 427 P.2d 820].) In cases such as this, however, the trial court must be particularly aware of the possible prejudice to the victim, since instructions on the necessity defense will likely allow the introduction of evidence which has the effect of putting the victim's beliefs on trial. (See *Katz* v. *Superior Court* (1977) 73 Cal.App.3d 952, 986 [141 Cal.Rptr. 234]; cf. Evid. Code, § 1103, subd. (2)(a).) Patrick punctuates the potential for abuse of this defense in his brief, arguing "[t]he American jury stands not only as the trier of fact, but as the conscience of the community. Because necessity involves a balancing of moral values (or evils), it is appropriate that the jury decide whether the defendant made 'an objectively correct choice of values' [citation]." But it is precisely because such a moral value judgment can never be truly "objective" that application of the necessity defense in contexts such as this must be closely scrutinized.

Secondly, we note some discomfort with Patrick's failure to present any evidence demonstrating a danger of imminent *physical* harm to Roberta. The offer of proof focused on psychological harm, personality change and unorthodox morality. We do not dispute the fact that individuals may suffer harm of other than a physical nature. (Cf. *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R. 3d 1316].) But as noted previously, the problem with such an approach here lies in attempting to find an objective definition of "psychological harm" where the victim consents to being "harmed." It may be that protection of victims in such situations must depend on legislative and law enforcement action focused not on the doctrines and beliefs of the "cult" but rather on the allegedly coercive methods used to recruit and indoctrinate new members.

Finally, Patrick assumes that if the McElfishes' subjective belief in the danger to their daughter was objectively justifiable, then he, acting

---

Roberta's whereabouts or their attempts to seek help from various government agencies. But the imminence requirement is not a penalty; it is merely one of several factors necessarily present if the defendant's criminal action is to be justified. The critical point is that a four-year separation, regardless of its cause, may result in a changed situation. Having failed to adequately investigate the new situation as it existed in 1979, the McElfishes could present no evidence of an immediate danger to Roberta in March of that year.

as their agent, is entitled to assert the necessity defense. We do not agree. For any person to successfully invoke the defense of necessity, he must personally possess a reasonable belief in the justifiability of his actions. This imposes an independent duty on agents to take all appropriate steps necessary to investigate the reasonableness of the beliefs held by their principals in order to convince themselves of the necessity of criminal action. In this case, Patrick points to no actions which he took to independently assure himself that Roberta was a member of a cult or that forcible abduction and deprogramming was the only reasonable alternative available. As such, Patrick's offer of proof is deficient in failing to demonstrate he personally possessed a belief in the necessity of criminal action.

Under these circumstances, the trial court did not err in excluding evidence and refusing instructions on the defense of necessity.

*Testimony of Robert Clark*

Robert Clark, the private investigator hired by Marye Rita after the El Centro arrests, testified against Patrick at the preliminary hearing. He was unavailable at trial due to illness, and the transcript of his preliminary hearing testimony was read to the jury. ■ Patrick argues the admission of this testimony denied him his constitutional right of confrontation (see U. S. Const., 6th Amend.; Cal. Const., art. I, § 15) because his opportunity to cross-examine Clark at the preliminary hearing was impaired due to the unavailability of a particular piece of impeachment evidence. He also asserts that additional impeachment evidence relating to Clark's testimony was improperly excluded at trial.

As noted previously, Clark testified at the preliminary hearing that Patrick reoffered "snatch men" to Marye Rita and Mary Cecilia when he spoke with them following the arrests in El Centro. This statement was disputed by both women. On the first day of trial, the prosecutor discovered a tape recording of part of an interview between Clark and Raymond Cameron, an investigator for the district attorney's office. The investigator had apparently forgotten about the existence of the tape. In describing the incident with Patrick on the tape, Clark failed to mention the "snatch men" reference.

We cannot agree with Patrick that the unavailability of the tape at the preliminary hearing denied him the "complete and adequate opportunity to cross-examine" which is constitutionally required. (*Pointer* v.

*Texas* (1965) 380 U.S. 400, 407 [13 L.Ed.2d 923, 928, 85 S.Ct. 1065]; *People* v. *Moran* (1974) 39 Cal.App.3d 398, 406 [114 Cal.Rptr. 413]; see also *California* v. *Green* (1970) 399 U.S. 149, 165 [26 L.Ed.2d 489, 501, 90 S.Ct. 1930].) To begin with, defense counsel at the preliminary hearing was not unaware of the impeachment relevance of the "snatch men" reference; he knew the testimony of two key prosecution witnesses would unequivocally deny Patrick made the statement. Second, the unavailability of the tape at the preliminary hearing did not render it valueless as an impeachment tool; it could have been introduced to support the testimony of Marye Rita and Mary Cecilia. Finally, it would appear Clark had a ready explanation for his failure to mention the "snatch men" reference during the taped interview; Investigator Cameron testified at trial that Clark had related the "snatch men" statement in an earlier part of the interview which was not recorded.

We emphasize Patrick does not allege any intentional act on the part of the prosecution in withholding the tape. It was, in fact, turned over to defense counsel as soon as it was discovered. Patrick's argument would suggest the preliminary hearing testimony of an unavailable witness is always constitutionally inadmissible if any significant piece of impeachment evidence is discovered after the hearing. Given the large amount of investigation which normally occurs between the time of the preliminary hearing and the time of trial, the requirement advocated by Patrick would severely, and we think unnecessarily, limit the use of such prior testimony. We do not mean to imply that a piece of subsequently discovered impeachment evidence can never be so significant as to deprive the defendant of his constitutional right of confrontation. To the contrary, since the primary function of cross-examination is impeachment, effective cross-examination is necessarily closely related to impeachment ability. Nevertheless, where defense counsel at the time of the preliminary hearing is aware of the significance of that portion of the witness' testimony to which the new evidence relates, where there is additional and significant impeachment evidence on the same point, and where the subsequently discovered evidence is not rendered valueless as an impeachment tool at trial by the absence of the witness, we conclude the confrontation clause does not require exclusion of the prior testimony.

■ Patrick also argues the trial court improperly excluded evidence of prior inconsistent statements by Clark. (See Evid. Code, § 1235.) The statements, allegedly made shortly after the incidents in El Centro, described a number of improper police tactics which occurred in con-

junction with the arrest and incarceration of the McElfishes.[8] The trial court reviewed the statements but concluded (1) the statements were not materially inconsistent with Clark's testimony, (2) the probative value to the defendant was substantially outweighed by the prejudice to the People, and (3) the introduction of the statements was likely to mislead and confuse the jury. The court then excluded the evidence pursuant to Evidence Code section 352.

A trial court ruling under Evidence Code section 352 is reviewable only to determine whether the court abused its discretion (*People v. Kelley* (1977) 75 Cal.App.3d 672, 678 [142 Cal.Rptr. 457]). Here, the portion of Clark's testimony which Patrick sought to impeach involved statements by Clark denying having been told the McElfishes were coerced into signing something and indicating Marye Rita and Mary Cecilia were too distraught to relate exactly what happened to them. The court permitted both Marye Rita and Mary Cecilia to testify as to what they told Clark regarding their treatment by police.

While the impeaching statements are effectively inconsistent with Clark's preliminary hearing testimony (*People v. Green* (1971) 3 Cal.3d 981, 988 [92 Cal.Rptr. 494, 479 P.2d 998]), we nevertheless find no abuse of discretion by the trial court. It properly concluded the evidence would tend to mislead the jury since the McElfishes' treatment by law enforcement authorities was a topic collateral to the central issues in the trial. (See *People v. Benjamin* (1974) 40 Cal.App.3d 1035, 1042 [115 Cal.Rptr. 668]; Witkin, Cal. Evidence (2d ed. 1966) § 1259 et seq., pp. 1162-1167.) Moreover, the impeaching statements contained numerous references which, although extremely prejudicial to the prosecution, were clearly not inconsistent with any testimony given by Clark. Since the court had previously allowed Marye Rita and Mary Cecilia to impeach the specific portions of Clark's testimony, the court did not err in excluding the additional evidence under Evidence Code section 352. Finally, even if the decision to exclude the evidence could be considered error, it cannot reasonably be said to have prejudiced Patrick. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed. 2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

---

[8] Clark apparently spoke with a radio talk show hostess in Los Angeles and with Patrick's attorney. He is alleged to have stated the McElfishes were not advised of their *Miranda* rights and were prohibited from making phone calls; Investigator Cameron had been improperly portrayed as a district attorney; the Monday following the arrests was falsely stated to be a court holiday; Cameron had a personal vendetta against Patrick; and the McElfishes were the victims of varied sorts of coercion and intimidation by law enforcement personnel.

*False Imprisonment and Conspiracy to Falsely Imprison as Lesser Included Offenses*

 Patrick was found guilty of two substantive crimes (kidnaping and false imprisonment) as well as two separate conspiracies to commit those substantive crimes. He notes that false imprisonment is a lesser included offense of kidnaping (*People v. Gibbs* (1970) 12 Cal.App.3d 526, 547 [90 Cal.Rptr. 866]), which requires the false imprisonment conviction be stricken. (See *People v. Moran* (1970) 1 Cal.3d 755, 763 [83 Cal.Rptr. 411, 463 P.2d 763].) He also argues that conspiracy to commit false imprisonment may be a lesser included offense of conspiracy to kidnap, and because the instructions in the instant case did not require the jury to distinguish two different conspiracies, the conviction for conspiracy to falsely imprison must also be stricken.

The Attorney General concedes Patrick's conviction for the substantive crime of false imprisonment must be stricken. He argues, however, that Patrick was not separately sentenced for the conspiracy to commit false imprisonment (see Pen. Code, § 654); the conviction itself was thus proper since a conspiracy to commit false imprisonment is not *necessarily* a lesser included offense in a conspiracy to kidnap.

As Patrick points out, however, the problem with the Attorney General's argument is the instructions given to the jury allowed them to convict Patrick of two conspiracy offenses based on exactly the same conduct. The indictment charging the two conspiracies alleged the same 15 overt acts for each conspiracy. The jury was not instructed that a single agreement to commit acts which, if completed, would constitute more than one substantive crime, is but a single conspiracy. (*Braverman v. United States* (1942) 317 U.S. 49, 53 [87 L.Ed. 23, 28, 63 S.Ct. 99]; *People v. Zamora* (1976) 18 Cal.3d 538, 560, fn. 21 [134 Cal.Rptr. 784, 557 P.2d 75].) Accordingly, Patrick's conviction on the charge of conspiring to commit false imprisonment must be stricken.

*Nature of the Kidnaping Crimes*

 Focusing on the period of time following Roberta's abduction from the Tucson restaurant during which the various members of the McElfish family were detained and questioned by Tucson and Phoenix police, Patrick argues the facts demonstrate two separate conspiracies to kidnap Roberta. He suggests the first ended with the arrival of police and the second began when John Zombro ignored Roberta's requests to

return her to her home in Tucson. Patrick asserts that because the jury was not instructed they must agree on which conspiracy he was a part of, his conviction must be reversed. He similarly contends that because the jury was not instructed regarding agreement on which set of acts constituted the substantive crime of kidnaping, that conviction must also be reversed. (See *People* v. *Madden* (1981) 116 Cal.App.3d 212, 219 [171 Cal.Rptr. 897].)

Patrick cites *People* v. *Saling* (1972) 7 Cal.3d 844, 852 [103 Cal.Rptr. 698, 500 P.2d 610], for the proposition that "a conspiracy continues until the substantive crime is either attained or defeated."[9] In the instant case, however, the McElfishes were able to *avoid* defeat of their kidnaping plan by pretending to abandon it and fraudulently promising to return Roberta to her home in Tucson. Roberta was induced not to press charges. Yet as soon as Zombro and Bobby McElfish rejoined Mary Cecilia in Tucson, it was clear the scheme was being picked up where it had been left off, with the same ultimate objective: the deprogramming of Roberta by Ted Patrick. The detention and questioning which occurred in Phoenix and Tucson in no way can be classified as a permanent defeat of the conspiracy objective; at most it was a temporary setback. Thus there was no basis upon which to instruct the jury regarding more than one conspiracy.

Similarly, with regard to the substantive crime, the evidence strongly suggests one kidnaping involving two periods of forcible asportation separated by a period during which Roberta's cooperation was obtained by means of a fraudulent misrepresentation. Since kidnaping may be either by force or fraud (Pen. Code, § 207; *State* v. *Miguel* (Ariz.App. 1980) 611 P.2d 125, 129), there was arguably only one crime of kidnaping committed.

But even if the jury were to have found two kidnapings occurred, and we do not deny the evidence is susceptible of such an interpretation, we do not think the trial court's failure to instruct the jury regarding the need for unanimous agreement on the acts constituting the kidnaping prejudiced Patrick. As a member of the conspiracy to kidnap Roberta, Patrick's liability for the substantive crime was premised on his acts as

---

[9] His paraphrasing is a bit misleading. The *Saling* court actually stated, "The conspiracy *usually* comes to an end when the substantive crime ... is either attained or defeated." (*Ibid.*; italics added.)

an aider and abettor. Given that it is the second kidnaping (under Patrick's theory) which gives rise to California's prosecutorial jurisdiction and considering the telephone instructions he gave to Mary Cecilia in El Centro, just prior to the arrests, we do not think it reasonably probable a more favorable result would have been reached had the trial court given the agreement instruction. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

*Instructions on Aiding and Abetting*

As noted, Patrick's liability for the substantive crime of kidnaping was premised on his actions as an aider and abettor of the McElfishes. He has not challenged the sufficiency of the evidence to support that finding. Instead, he argues the trial court improperly instructed the jury concerning the prerequisites for aider and abettor liability.

The challenged jury instruction stated, "A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime." In *People v. Yarber* (1979) 90 Cal.App.3d 895 [153 Cal.Rptr. 875], the court found this particular instruction defective because it failed to require a finding that the defendant *intended* to aid the perpetrator in the commission of the crime. "Intent is what must be *proved*; from a person's action with knowledge of the purpose of the perpetrator of a crime, his intent to aid the perpetrator can be *inferred*. In the absence of evidence to the contrary, the intent may be regarded as established. But where a contrary inference is reasonable—where there is room for doubt that a person intended to aid a perpetrator—his knowledge of the perpetrator's purpose will not suffice." (*Id.*, at p. 916; fn. omitted.)[10]

---

[10]The *Yarber* court's analysis suggests that liability as an aider and abettor requires both knowledge of the perpetrator's criminal purpose and an intent to aid or further that purpose. In *People v. Tewksbury* (1976) 15 Cal.3d 953 [127 Cal.Rptr. 135, 544 P.2d 1335], however, the Supreme Court indicated a defendant could be convicted as an aider and abettor if he "realized that a [crime] was being planned and that [he] was facilitating its commission." (*Id.*, at p. 960.) Under this standard, it would appear that *knowing* aid or furtherance of a criminal purpose would be sufficient to sustain a conviction. (See *Yarber, supra*, 90 Cal.App.3d at p. 916, fn. 9.) Under either formulation, however, the instruction given in the instant case fails because it does not specify a particular mental state (i.e., knowing or purposeful) applicable to the aid given the perpetrator. Thus, the instruction would technically allow a conviction if the defendant, knowing of the perpetrator's unlawful purpose, negligently or accidentally aided the commission of the crime.

Assuming arguendo the correctness of the *Yarber* court's analysis, we nevertheless conclude the erroneous instruction did not prejudice Patrick. At trial, defense counsel did not argue that Patrick *unintentionally* aided the McElfishes. Rather, the defense theory was that while Patrick may have had knowledge of the McElfishes' illegal purposes, he did not in fact aid them in the commission of the kidnaping. The instruction as given required *both* knowledge of criminal purpose *and* a finding Patrick aided in the commission of the crime. Moreover, in the words of the *Yarber* court, there is an "absence of evidence to the contrary" negating the logical inference of intent.

*Additional Contentions*

Patrick raises several additional arguments, all of which we have concluded to be without merit. We summarize them below.

■ The court refused a defense request to instruct the jury pursuant to CALJIC Nos. 9.26 and 9.28 that a reasonable belief by the actor that the victim consented to the asportation is a defense to kidnaping.[11] A trial court need only instruct on a requested defense where evidence is presented from which a reasonable jury could find the defense applicable (*People* v. *Flannel, supra,* 25 Cal.3d 668, 684). The evidence must be "substantial enough to merit consideration." (*Ibid.,* at fn. 12.) In the instant case, there was no substantial evidence from which a jury could conclude Roberta consented to her abduction in Tucson or her transportation to El Centro. All the evidence points to a forcible taking in both instances. The trial court did not err in refusing the instruction.

Patrick next contends the trial court erred in permitting reference to Sondra Sacks as an unindicted coconspirator following the granting of her Penal Code section 995 motion (see p. 959, *ante*). He invokes the

---

[11]CALJIC No. 9.26 states: "When one in the exercise of his own free will, and with knowledge of what is taking place with respect to his person, voluntarily and willingly consents to accompany another, the latter cannot be guilty of kidnaping the former so long as such condition of consent exists."

CALJIC No. 9.28 states: "It is a defense to a charge of kidnaping that the defendant entertained a reasonable and good faith belief that the person alleged to have been kidnaped voluntarily consented to accompany the defendant and to the movement involved in the alleged kidnaping. If from all the evidence you have a reasonable doubt whether the defendant reasonably and in good faith believed that the person alleged to have been kidnaped voluntarily consented to accompany the defendant and to the said movement, you must give the defendant the benefit of that doubt and acquit him of said charge."

doctrine of collateral estoppel in arguing the granting of the Penal Code section 995 motion precludes later reference to Sacks as a member of the conspiracy. It is well established, however, collateral estoppel is "inapplicable to orders dismissing criminal proceedings following preliminary hearings." (*People* v. *Uhlemann* (1973) 9 Cal.3d 662, 667-668 [108 Cal.Rptr. 657, 511 P.2d 609].)[12] Certainly if dismissal of an information or indictment does not bar further criminal proceedings against the dismissed defendant, mere reference to her as an "unindicted coconspirator" is not prohibited. In any case, the reference reasonably cannot be said to have prejudiced Patrick since evidence of her involvement was clearly admissible.

 ■ Finally, Patrick disputes the trial court's decision to impose, as a condition of probation, a requirement that he submit to warrantless searches by law enforcement personnel. The court imposed the condition to help in ascertaining whether Patrick was abiding by other conditions of probation that he only engage in deprogramming on a voluntary basis. Considering the connection between Patrick's vocation and the crimes of which he was convicted, the search condition reasonably relates to the prospect of future criminality. (See *People* v. *Dominguez* (1967) 256 Cal.App.2d 623, 627 [64 Cal.Rptr. 290].) The trial court did not abuse its discretion in imposing the condition.

*Disposition*

 The convictions on counts one and two (false imprisonment and conspiracy to commit false imprisonment) are stricken. In all other respects, the judgment is affirmed.

 Work, J., and Levitt, J.,* concurred.

 A petition for a rehearing was denied January 4, 1982, and appellant's petition for a hearing by the Supreme Court was denied March 11, 1982.

---

[12]We see no functional reason to distinguish between dismissals following preliminary hearings and dismissals pursuant to section 995.

 *Assigned by the Chairperson of the Judicial Council.