Filed 5/26/21  P. v. Nguyen CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>   v.<br><br>LOM NGUYEN,<br><br>       Defendant and Appellant. | C087717<br><br>(Super. Ct. No. MAN-CR-FECOD-2017-0014636) |

Defendant Lom Nguyen was convicted by jury of three counts of identity theft, one count of conspiracy to commit identity theft, three counts of check forgery, one count of forgery of a driver's license, one count of acquiring personal identifying information of at least 10 individuals, one count of conspiracy to acquire such information, one count

1

of misdemeanor mail theft, and one count of misdemeanor receiving stolen property.[1] In a bifurcated proceeding, defendant was found to have served three prior prison terms. The trial court sentenced defendant to an aggregate determinate prison term of 10 years 8 months.

On appeal, defendant contends: (1) the evidence is insufficient to support one of his identity theft convictions and a related check forgery conviction (counts 10 & 12) involving the same victim; (2) we must reverse his conviction for conspiracy to acquire personal identifying information (count 9) because, as that offense was pleaded in the information, it is the same offense as conspiracy to commit identity theft (count 3), for which defendant was also convicted; (3) the sentence imposed on one of defendant's check forgery convictions and a related conviction for forgery of a driver's license (counts 4 & 5) should have been stayed because these offenses were part of the same continuous course of conduct supporting one of his identity theft convictions (count 1) involving the same victim; (4) we must strike defendant's one-year prior prison term enhancements because Senate Bill No. 136 (2019-2020 Reg. Sess.) (Senate Bill 136) applies retroactively to cases not yet final on appeal and eliminates such enhancements for defendant's crimes; and (5) the trial court violated defendant's constitutional right to due process by imposing a restitution fine, parole revocation fine, and other mandatory assessments without determining his ability to pay.

We conclude the evidence is more than sufficient to support defendant's convictions on counts 10 and 12. With respect to counts 3 and 9, we conclude defendant was improperly convicted of two counts of conspiracy based on a single agreement to commit multiple substantive crimes. Defendant's conviction in count 9 must therefore be

---

[1] The jury was unable to reach a unanimous verdict with respect to three additional counts. These counts were dismissed in the interest of justice.

vacated. Turning to defendant's claims of sentencing error, we conclude the trial court erred in declining to stay execution of the sentences imposed on counts 4 and 5 pursuant to Penal Code section 654.[2] Defendant's one-year prior prison term enhancements must also be stricken. Finally, the trial court did not violate defendant's constitutional rights by imposing the challenged fines and assessments. We shall therefore vacate defendant's conviction in count 9, strike the sentence imposed thereon, further strike defendant's one-year prior prison term enhancements, and remand the matter to the trial court for resentencing with directions to impose and stay full term sentences on counts 4 and 5 pursuant to section 654.

## FACTS

On the night of October 24, 2017, defendant picked up Jeanne Mendoza at her cousin's house in Stockton. He arrived in a U-Haul truck that Mendoza had loaned to him a few days earlier. Mendoza told her cousin, Kimi Matsuno, that she and defendant were going "mailboxing" in Elk Grove, by which she meant breaking into other people's mailboxes to steal checkbooks, credit cards, and anything else that might have value. Matsuno will also play a role in the larcenous events supporting defendant's convictions in this case.[3]

Defendant and Mendoza went to a friend's house, where they stayed up all night drinking alcohol and doing drugs. They began their mailbox operation the following afternoon. Mendoza drove into various neighborhoods in Elk Grove and defendant got out to break into the target mailboxes using a key he possessed for that purpose. Each

---

[2] Undesignated statutory references are to the Penal Code.

[3] Mendoza and Matsuno were charged as codefendants in this case. They each entered a negotiated plea agreement and testified against defendant at trial.

3

time he got out to do so, he returned with a stack of mail. After about an hour, they drove to a gas station in Tracy and went through the mail. Three envelopes contained credit cards; they also secured two books of checks. Defendant and Mendoza then drove to Lathrop, where they tried to use all three of the credit cards at a Target store. Each was declined. At this point, they returned to the truck and Mendoza called her cousin Matsuno.

Mendoza called her cousin because Matsuno knew about an internet café in Stockton that also provided various illegal services, including the creation of fraudulent DMV documents. Mendoza gave Matsuno the identifying information from the checkbooks she and defendant stole from the mailboxes and asked her to use the information to obtain temporary driver's licenses. Matsuno agreed. Mendoza's plan was to write checks using the stolen checks and present the fraudulent DMV documents as identification. She also planned to rent another truck at a U-Haul location in Manteca later in the evening and then pick up Matsuno and the fraudulent DMV documents in Morada, at which point Matsuno would take over driving because Mendoza was tired from having been up for a few days.

Defendant dropped Mendoza off near the U-Haul location in Manteca, but she was unable to rent the new truck, so she called defendant and asked him to pick up Matsuno. In the meantime, Matsuno obtained the requested DMV documents. Apparently, defendant was on his way to Stockton after dropping off Mendoza. He agreed to pick up Matsuno and then double back to Manteca to pick up Mendoza. Mendoza also called her cousin to let her know about the change in plans.

Defendant picked up Matsuno at around 8:00 p.m. She immediately took over driving because defendant was also tired. When they got to Mendoza's location in Manteca, Matsuno gave her cousin a folder containing the requested fraudulent DMV documents. During the drive, Matsuno noticed the truck was almost out of gas. She pointed this out, but no one had money for gas. Mendoza suggested going to the mall in

Modesto to "try to get some money" there. Matsuno understood this to mean either writing a check for merchandise that could be returned for money or returning merchandise she already had in her possession. She was correct. Mendoza testified that she intended to return items she previously bought by fraudulent means at Victoria's Secret.

They arrived at the mall just before it closed. Mendoza went inside to attempt the return.[4] Matsuno and defendant initially stayed in the truck, but Matsuno decided to go inside to check on her cousin. Inside the mall, Mendoza told her cousin "it didn't work" and that she wanted to leave. When they returned to the parking lot, defendant had moved the truck. It was now parked in front of J.C. Penney. Inside the truck, defendant was in the driver's seat with two bags from that store. Matsuno asked where the bags came from. Defendant responded: "I smacked, don't trip." Matsuno understood this to mean that defendant was able to buy items from J.C. Penney with someone else's credit card. He put the bags behind the seat and Matsuno went back inside the mall to again locate her cousin, who had gone into Forever 21 to try to make a purchase using one of the stolen checks.

When all members of the group had reconvened at the truck, Matsuno's focus turned to getting gas. She drove to the nearest gas station, but it was closed. Defendant and Mendoza were more focused on "making money" with their stolen items. They were "bickering back and forth" about where to go to do so. Matsuno became frustrated because, as she put it, "there was no gas, they didn't know what they were doing, they'd

---

**4**     As we set forth in greater detail later, Mendoza also tried to pass a stolen check in the amount of $1,012.13 for additional merchandise, but "[t]hat check did not go through." This check was part of a checkbook that was stolen from a mailbox in Stockton around October 12.

been up for days and I just couldn't do it." Matsuno decided to go home and started driving northbound on Highway 99. Around this time, Mendoza realized she had a few dollars on a prepaid card that could be used to buy gas. Matsuno pulled off of the freeway in Ripon and used that card to put some gas in the truck. At the gas station, Mendoza told her cousin she wanted to use one of the stolen checks to buy food, alcohol, and a gas card at a nearby SaveMart grocery store. Defendant was in the truck when this suggestion was made and did not object.

Matsuno drove the threesome to the store and Mendoza went inside to make the fraudulent purchase. It was now around 10:30 p.m. According to the store clerk, Mendoza seemed confused when she entered, walking through her check stand and then turning around to ask where the shopping carts were located; they were directly in front of her when she asked. After taking a cart, Mendoza proceeded to shop and then returned to the check stand to check out. She also asked the clerk for a Visa gift card, but was told she could not buy one if she was using a check to pay. The clerk then rang up the items Mendoza sought to purchase and Mendoza wrote a check for the total amount, using one of the stolen checks and the fraudulent temporary driver's license for identification purposes. The transaction was denied, causing the register to print out a slip of paper with a phone number for the customer to call. The clerk informed Mendoza of the situation and handed her the paper. Mendoza said she needed to use the restroom and would make the call to "have it fixed." She inadvertently left the fraudulent temporary driver's license at the register when she went to the restroom. The clerk looked more closely at the document and then called her manager because "it didn't feel right."

Meanwhile, out in the truck, defendant and Matsuno became concerned when Mendoza did not return for what seemed to be "a long time, 30 minutes." Defendant went inside to look for her. Asking the clerk if she knew where his friend was, defendant was directed to the restroom as Mendoza was coming back out. Defendant and Mendoza

6

left the store. As they did so, the clerk called the police, providing their description as well as the truck's license plate number.

The truck was pulled over a short distance from the store. The officer who initiated the vehicle stop spoke with the driver, Matsuno, who provided her name but did not have identification. The officer informed her that someone tried to pass a fraudulent check at SaveMart. Defendant was seated between Matsuno and Mendoza. A second officer who arrived to assist in the vehicle stop spoke with Mendoza. She provided two false names and claimed a friend had given her a check to use to buy groceries. Each occupant of the truck was removed from the vehicle.

During a search of defendant, officers found the key he used to open the mailboxes earlier in the day, as well as an identification card, Social Security card, and several credit cards issued to multiple individuals. After defendant was searched, Matsuno informed the officer that defendant and Mendoza had broken into several mailboxes.

Various items of incriminating evidence were also found inside the truck, including shopping bags containing merchandise and a garbage bag filled with mail and packages. Officers also found several checkbooks, credit cards, and identification cards belonging to various individuals, a methamphetamine pipe, notebooks containing the personal identifying information of numerous individuals, and the folder containing fraudulent DMV documents Matsuno brought for Mendoza earlier in the night.

Because defendant does not challenge the sufficiency of the evidence supporting most of his convictions, we decline to recount the testimony of the many victims who testified generally that their mail was stolen, items such as checkbooks or credit cards were taken, these items were used to purchase or attempt to purchase merchandise, and they neither knew defendant nor gave him permission to possess their mail, use their checks or credit cards to make purchases, obtain temporary driver's licenses on their behalf, or possess any of the personal identifying information contained in the notebooks

7

found in the U-Haul truck. Defendant does challenge the sufficiency of the evidence supporting one count of identity theft (count 10) and one count of check forgery (count 12). We discuss the evidence supporting these counts in greater detail immediately below.

DISCUSSION

I

*Sufficiency of the Evidence*

Defendant contends the evidence is insufficient to support his convictions for identity theft (count 10) and check forgery (count 12) committed against R.P. He is mistaken.

**A.**

*Legal Principles*

" 'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]' [Citations.] All conflicts in the evidence and questions of credibility are resolved in favor of the verdict, drawing every reasonable inference the jury could draw from the evidence. [Citation.] Reversal on this ground is unwarranted unless ' "upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' [Citation.] This standard applies whether direct or circumstantial evidence is involved. [Citation.]" (*People v. Cardenas* (2015) 239 Cal.App.4th 220, 226-227.)

The crime of identity theft is defined in section 530.5, subdivision (a) as follows: "Every person who willfully obtains personal identifying information, as defined in subdivision (b) of Section 530.55, of another person, and uses that information for any unlawful purpose, including to obtain, or attempt to obtain, credit, goods, services, real property, or medical information without the consent of that person, is guilty of a public

8

offense, and upon conviction therefor, shall be punished by a fine, by imprisonment in a county jail not to exceed one year, or by both a fine and imprisonment, or by imprisonment pursuant to subdivision (h) of Section 1170."[5]

In order to convict a defendant of this crime, the prosecution must prove the following elements: "(1) that the person willfully obtain[ed] personal identifying information belonging to someone else; (2) that the person use[d] that information for an unlawful purpose; and (3) that the person who use[d] the identifying information [did] so without the consent of the person whose personal identifying information [was] used." (*People v. Sanders* (2018) 22 Cal.App.5th 397, 405.) Thus, "[i]dentity theft is not actually a theft offense," but rather "seeks to protect the victim from the misuse of his or her identity." (*Ibid.*; see also *People v. Valenzuela* (2012) 205 Cal.App.4th 800, 808 [" 'identity theft in the electronic age is an essentially unique crime, not simply a form of grand theft' "].)

The crime of check forgery is defined in section 470, subdivision (d). This subdivision provides in relevant part: "Every person who, with the intent to defraud, falsely makes, alters, forges, or counterfeits, utters, publishes, passes or attempts or offers

---

**5**      Section 530.55, subdivision (b) defines " 'personal identifying information' " to mean "any name, address, telephone number, health insurance number, taxpayer identification number, school identification number, state or federal driver's license, or identification number, social security number, place of employment, employee identification number, professional or occupational number, mother's maiden name, demand deposit account number, savings account number, checking account number, PIN (personal identification number) or password, alien registration number, government passport number, date of birth, unique biometric data including fingerprint, facial scan identifiers, voiceprint, retina or iris image, or other unique physical representation, unique electronic data including information identification number assigned to the person, address or routing code, telecommunication identifying information or access device, information contained in a birth or death certificate, or credit card number of an individual person, or an equivalent form of identification."

9

to pass, as true and genuine, any of the following items, knowing the same to be false, altered, forged, or counterfeited, is guilty of forgery: any check . . . .” (§ 470, subd. (d).) Thus, as relevant here, check forgery has the following elements: (1) the false making or passing of a check as true and genuine; (2) knowledge of the check’s falsity; and (3) intent to defraud. (See *People v. Gaul-Alexander* (1995) 32 Cal.App.4th 735, 741.)

Finally, we note that “[a]ll persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed.” (§ 31.) “[A]ider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator’s actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor’s mens rea— knowledge of the direct perpetrator’s unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor’s actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.” (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

With these legal principles in mind, we now describe the evidence supporting the challenged convictions.

**B.**

*Relevant Testimony*

R.P. testified that her mailbox in Stockton was broken into around October 12, 2017. A checkbook was stolen during the break in. Eight checks were later signed in her name and used to attempt purchases at various stores. Mendoza admitted signing these checks and attempting to pass them. A check in the amount of $1,012.13 was written at Victoria’s Secret in the mall in Modesto on October 25, possibly during the same transaction in which Mendoza unsuccessfully attempted to return previously purchased merchandise in order to obtain gas money. This check “did not go through.”

The remaining seven checks were written between October 20 and 24. A check in the amount of $1,379 was written at Nordstrom. A check in the amount of $2,707.64 was

10

written at Home Depot.  A check in the amount of $287.04 was written at SaveMart.  A check in the amount of $120.85 was written at Safeway.  A check in the amount of $138.76 was written at Big Lots.  A check in the amount of $130.08 was written at Safeway.  A check in the amount of $189.48 was written at Raley's.  The record is unclear with respect to whether any of these checks went through or were also rejected.

Mendoza testified that defendant gave her R.P.'s stolen checkbook about a week before their arrest, explaining:  "He stole them and brought them for me to try and write."  R.P. testified that she did not know defendant or Mendoza, did not give them permission to possess her checks, and did not give them permission to attempt to pass them.  During R.P.'s testimony, she was shown a deposit slip that came from her stolen checkbook; her Social Security number was written on the deposit slip.  R.P. was also shown a temporary driver's license that was obtained using her name, address, and date of birth.  R.P. did not give defendant or anyone else permission to possess her identifying information or use this information to obtain a temporary driver's license.  These items of evidence were found in Mendoza's purse after the U-Haul was pulled over on October 25.

Finally, one of the notebooks found in the U-Haul contained R.P.'s name, maiden name, Social Security number, current address, a previous address, current and prior phone numbers, and an e-mail address she did not recognize.  R.P. did not give defendant, Mendoza, or Matsuno permission to possess any of this information.

## C.

### *Analysis*

We begin by noting defendant does not dispute the crimes of identity theft and check forgery were committed against R.P.  We therefore decline to proceed element-by-element in analyzing the evidence supporting these crimes.  Defendant does dispute his involvement.  He argues the evidence is insufficient to support a conclusion that he aided and abetted Mendoza in her commission of these crimes.  We are not persuaded.

First, while defendant is technically correct that "[t]here is no evidence that [he] was with Ms. Mendoza when that mailbox theft occurred," his suggestion that Mendoza broke into the mailbox without him is belied by Mendoza's testimony. As recounted above, she denied stealing R.P.'s checkbook and claimed defendant gave her the checkbook so that she could try to pass the checks. This testimony alone is sufficient to support defendant's conviction for check forgery on an aiding and abetting theory. Again, defendant does not dispute Mendoza committed this crime. If Mendoza's testimony is believed, defendant gave her R.P.'s checkbook with knowledge of Mendoza's unlawful intent, intended to assist her in achieving those unlawful ends, and assisted her by giving her the means to do so. (See *People v. Perez*, *supra*, 35 Cal.4th at p. 1225.)

Second, although defendant is also correct that the fraudulent temporary license that was obtained using R.P.'s information was found in Mendoza's purse and was likely obtained from Matsuno prior to the night the three of them were arrested, this says nothing about whether defendant was aware of Mendoza's intent to use R.P.'s identifying information for an unlawful purpose, intended to assist her in doing so, and actually assisted her by giving her the stolen checkbook containing the personal identifying information.

However, other evidence establishes these aiding and abetting elements. Again, Mendoza testified that defendant gave her R.P.'s checkbook so that she could attempt to pass the checks. R.P.'s personal identifying information was contained on these checks. Additional personal identifying information was also written on a deposit slip in the checkbook and in one of the notebooks found in the truck. These notebooks also contained the personal identifying information of numerous other victims. Finally, defendant was with Mendoza when she contacted Matsuno about creating fraudulent temporary driver's licenses using the personal identifying information from the checkbooks they stole in Elk Grove. A reasonable inference arising from this evidence is

12

that an integral part of the scheme to steal mail and pass stolen checks was obtaining fraudulent temporary driver's licenses in the name of the person whose checks were to be passed in order to use these documents as identification. Indeed, as the Attorney General points out in the respondent's brief, defendant "does not challenge the sufficiency of the evidence for his convictions related to [the other] victims, whose identifying information was also found in the red notebook and had fraudulent checks passed by Mendoza from their accounts on October 24 and 25, 2017." We agree with the Attorney General's assessment that the same reasonable inference arises with respect to R.P. as with these other victims.

The evidence is more than sufficient to support defendant's convictions for check forgery and identity theft involving R.P.

## II

### *Propriety of Defendant's Conspiracy Convictions*

Defendant also claims we must reverse his conviction for conspiracy to acquire personal identifying information (count 9) because, as that offense was pleaded in the information, it is the same offense as conspiracy to commit identity theft (count 3), for which defendant was also convicted. The Attorney General disagrees, arguing these counts do not charge the same criminal act because defendant was charged in count 3 with conspiracy to commit identity theft in violation of section 530.5, subdivision (a) by conspiring with Mendoza and Matsuno to use the identifying information of one of the victims, L.S., to attempt to pass one of her checks at the SaveMart on the night they were arrested, whereas he was charged in count 9 with conspiracy to commit identity theft in violation of section 530.5, subdivision (c)(3) by conspiring with Mendoza and Matsuno to acquire the personal identifying information of 10 or more people with the intent to defraud.

While we agree with the Attorney General that each count alleges a conspiracy to commit a different substantive offense, the question we must resolve is whether this

13

amounts to two separate conspiracies, or rather one conspiracy to commit two substantive offenses. The answer is the latter.

"[W]hen a single agreement to commit one or more substantive crimes is evidenced by an overt act, as the statute requires, the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects. Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one." (*Braverman v. United States* (1942) 317 U.S. 49, 53 [87 L.Ed. 23] (*Braverman*).) "The single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute." (*Id.* at p. 54; see *People v. Lopez* (1994) 21 Cal.App.4th 1551, 1557 (*Lopez*).)

In *Braverman*, the defendants were charged with multiple counts of conspiracy based on an agreement that would entail violating statutory restrictions on the manufacture, transportation, and distribution of liquor. (*Braverman*, *supra*, 317 U.S. at pp. 50-51.) It was conceded that all of the statutory violations were pursuant to a single agreement. The United States Supreme Court determined that under such circumstances, it was improper to find "that even though a single agreement is entered into, the conspirators are guilty of as many offenses as the agreement has criminal objects." (*Id.* at p. 53.)

In *Lopez*, the defendant was found guilty by jury of three conspiracy counts: conspiracy to illegally dispose of hazardous substances, conspiracy to manufacture methamphetamine, and conspiracy to possess methamphetamine for sale. (*Lopez*, *supra*, 21 Cal.App.4th at pp. 1553-1554.) The charges were based on an agreement the defendant made with an undercover sheriff's deputy to receive a large quantity of ephedrine from him in return for a portion of the methamphetamine the defendant

14

planned to manufacture using the ephedrine. (*Ibid.*) The appellate court held: "[A]ll three of the charged crimes were for one ultimate purpose, sale of methamphetamine for financial gain. All of the acts in each of the three target crimes were incidental to this objective, and many acts were a direct part of more than one of the crimes. Under these circumstances, but one count of conspiracy can be sustained." (*Id.* at pp. 1558-1559.)

Similarly, in *People v. Patrick* (1981) 126 Cal.App.3d 952, the defendant was convicted of two counts of conspiracy concerning the same victim: conspiracy to kidnap and conspiracy to falsely imprison. Noting the defendant was charged with the same overt acts for each conspiracy, the appellate court struck one of the conspiracy convictions because "the instructions given to the jury allowed them to convict [the defendant] of two conspiracy offenses based on exactly the same conduct." (*Id.* at p. 965.)

Comparable circumstances underlie defendant's conspiracy convictions. The same overt acts were charged as to each count of conspiracy. No evidence was presented to support findings of two separate agreements, one with respect to using L.S.'s personal identifying information for the unlawful purpose of passing one of her checks at SaveMart and another with respect to acquiring the personal identifying information of 10 or more individuals with the intent to defraud. To the contrary, the evidence suggests there was one overarching agreement among the conspirators to steal checks and credit cards from mailboxes, use the personal identifying information from these items to create fraudulent DMV documents in order to enable them to fraudulently use the credit cards and pass the checks. While this agreement envisages violation of several criminal statutes, we cannot conclude on these facts that there were two separate agreements, and therefore two criminal conspiracies.

We must therefore vacate one of the conspiracy convictions.

## III

### *Section 654*

Defendant further asserts the sentence imposed on his convictions for check forgery (count 4) and forgery of a driver's license (count 5) should have been stayed because these offenses were part of the same continuous course of conduct supporting one of his identity theft convictions (count 1).  We agree.

### A.

### *Legal Principles*

"An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  (§ 654, subd. (a).)  "The purpose of this statute is to prevent multiple punishment for a single act or omission, even though that act or omission violates more than one statute and thus constitutes more than one crime.  Although these distinct crimes may be charged in separate counts and may result in multiple verdicts of guilt, the trial court may impose sentence for only one of the separate offenses arising from the single act or omission—the offense carrying the highest punishment."  (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312; *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1345.)

"Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective."  (*People v. Corpening* (2016) 2 Cal.5th 307, 311.)  Where "different crimes were completed by a 'single physical act[]' . . . the defendant may not be punished more than once for that act."  (*Ibid*.)  For example, "the forceful taking of a vehicle on a particular occasion is a single physical act under section 654"

16

despite the fact that this act amounts to both a robbery and a carjacking. (*Id*. at p. 313; see *id.* at p. 314.)

Where, as here, there is more than one physical act, the following rule applies: "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on another point in *People v. Correa* (2012) 54 Cal.4th 331, 338; *People v. Rodriguez* (2009) 47 Cal.4th 501, 507.) "In such a case, the defendant's single intent and objective are treated as a single act. For example, a defendant who enters a building with the intent to commit theft and then takes something of value cannot be sentenced for both burglary and theft. Although the defendant committed two criminal acts (entering the building and taking the property), the two acts 'were parts of a continuous course of conduct and were motivated by one objective, theft; the burglary, although complete before the theft was committed, was incident to and a means of perpetrating the theft.' [Citation.]" (*In re Jose P.* (2003) 106 Cal.App.4th 458, 469, disapproved on another point in *People v. Prunty* (2015) 62 Cal.4th 59, 78, fn. 5; see also *People v. Latimer* (1993) 5 Cal.4th 1203, 1216 [defendant convicted of kidnapping and rape; separate punishment for kidnapping not permitted because the sole objective of the kidnapping was to facilitate the rape].)

However, if the "defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]" (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

" 'Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its

17

findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence.' [Citation.]" (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1378.)

## B.

### *Analysis*

Counts 1, 3, 4, and 5 involved the same victim, L.S. In count 1, defendant was convicted of identity theft. In count 3, as explained more fully above, defendant was convicted of conspiracy to commit identity theft. In count 4, defendant was convicted of check forgery. In count 5, defendant was convicted of forgery of a driver's license. The trial court stayed execution of sentence on count 3 pursuant to section 654. The question is whether the court should have done the same with respect to counts 4 and 5. Defendant argues the answer is yes because each of these crimes was "part of a single course of conduct with the objective of using one of [L.S.'s] checks to get money or goods." The Attorney General disagrees. Relying on *People v. Neder* (1971) 16 Cal.App.3d 846 (*Neder*), he argues the two forgeries "involved different documents with different intents and objectives."

In *Neder*, the defendant was convicted of three counts of forgery based on a single trip into a Sears department store, during which his accomplice made three separate purchases from three different salesclerks using the victim's credit card and forging her name on each of the sales slips. (*Neder*, *supra*, 16 Cal.App.3d at pp. 849-850.) The appellate court held three separate punishable offenses were committed. Distinguishing *People v. Bailey* (1961) 55 Cal.2d 514, in which our Supreme Court held a series of takings constitutes a single theft offense "if the evidence shows that the offenses are . . . committed pursuant to one intention, one general impulse, and one plan" (*id*. at p. 519), the *Neder* court explained: "The essential act in all types of theft is taking. If a certain

18

amount of money or property has been taken pursuant to one plan, it is most reasonable to consider the whole plan rather than to differentiate each component part. [Citation.] The real essence of the crime of forgery, however, is not concerned with the end, i.e., what is obtained or taken by the forgery; it has to do with the means, i.e., the act of signing the name of another with intent to defraud and without authority, or of falsely making a document, or of uttering the document with intent to defraud. Theft pursuant to a plan can be viewed as a large total taking accomplished by smaller takings. It is difficult to apply an analogous concept to forgery. The designation of a series of forgeries as one forgery would be a confusing fiction." (*Neder*, at pp. 852-853, fn. omitted.) Turning to section 654, the court acknowledged each forgery was "incident to the fundamental objective of taking goods from Sears by use of the credit card and by forging the sales slips," but explained that "each forgery was certainly not a means for the accomplishment of any of the others." (*Neder,* at pp. 853-854.) The court concluded: "Each act of forgery was committed for the taking of certain goods, separate from and unrelated to the goods taken by the other forgeries." (*Id*. at p. 854.)

*Neder* is inapposite. In this case, we are not tasked with determining whether defendant may be punished for both forgery offenses, vis-à-vis each other. Instead, we must determine whether defendant may be separately punished for the forgery offenses, or either of them, vis-à-vis the identify theft offense committed against the same victim. In other words, were the forgery offenses committed pursuant to the same intent and objective as the identity theft? We conclude they were. The evidence adduced in this case establishes defendant's sole intent and objective in committing each crime was to obtain goods with the forged check. Defendant committed identify theft by obtaining and using L.S.'s personal identifying information for an unlawful purpose, specifically to attempt to obtain goods at SaveMart, as the prosecutor argued during her closing argument. Defendant committed check forgery with the same objective in mind. And while he arguably possessed a different intent in committing forgery of the temporary

19

driver's license, i.e., the intent to enable Mendoza to impersonate L.S., the only reason Mendoza needed to impersonate L.S. was to enable her to pass the forged check. Thus, even if there were multiple objectives, they were not "independent of [rather than] merely incidental to each other . . . ." (*People v. Harrison*, *supra*, 48 Cal.3d at p. 335.)

The trial court should have stayed execution of the sentences imposed on counts 4 and 5. We strike the sentences originally imposed on those counts and direct the trial court to impose and stay full term sentences on both counts on remand.

## IV

### *Retroactive Application of Senate Bill 136*

We also agree defendant's prior prison term enhancements must be stricken.

Effective January 1, 2020, Senate Bill 136 amended section 667.5, subdivision (b), to remove the one-year enhancement for prior prison terms, except when the offense underlying the prior prison term was a sexually violent offense. (See § 667.5, subd. (b).) Because Senate Bill 136 reduces sentences for a crime it applies retroactively to convictions not final on appeal absent evidence of a contrary legislative intent. (See *People v. Brown* (2012) 54 Cal.4th 314, 323-324; *In re Estrada* (1965) 63 Cal.2d 740, 745.) The enactment therefore applies to this case.

The offenses underlying defendant's prior prison terms were not sexually violent offenses. Accordingly, the prior prison term enhancements cannot stand. We shall therefore modify the judgment to strike each of defendant's one-year prior prison term enhancements.

## V

### *Imposition of the Restitution Fine and Other Mandatory Assessments*

Finally, defendant argues the imposition of the following mandatory fines and assessments violated his constitutional right to due process because the trial court did not determine his ability to pay before imposing them: (1) a restitution fine of $9,000 (§ 1202.4), (2) a parole revocation fine of $300 (§ 1202.45), (3) a court operations

20

assessment of $400 (§ 1465.8), (4) a court facilities assessment of $300 (Gov. Code, § 70373), and (5) a $900 surcharge (§ 1464).  He asks this court to stay the fines and vacate the assessments, or in the alternative, remand the matter to the trial court for an ability to pay determination.

This argument relies primarily on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, which held "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under . . . section 1465.8 and Government Code section 70373." (*Id.* at p. 1164.)  The *Dueñas* court also held "that although . . . section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Ibid.*)

The Attorney General responds by arguing this claim is forfeited by failing to object to the imposition of the challenged fines and assessments during the sentencing hearing.  Assuming, without deciding, that defendant's challenge to the mandatory fines and assessments have not been forfeited, we conclude *Dueñas* was wrongly decided and reject defendant's claim on that basis.

Our Supreme Court is now poised to resolve this question, having granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844, which agreed with the court's conclusion in *Dueñas* that due process requires the trial court to conduct an ability to pay hearing and ascertain a defendant's ability to pay before it imposes court facilities and court operations assessments under section 1465.8 and Government Code section 70373, but not restitution fines under section 1202.4.  (*Kopp,* at pp. 95-96.)

21

In the meantime, we join several other courts in concluding that the principles of due process do not require determination of a defendant's present ability to pay before imposing the fines and assessments at issue in *Dueñas* and in this proceeding. (*People v. Kingston* (2019) 41 Cal.App.5th 272, 279; *People v. Hicks* (2019) 40 Cal.App.5th 320, 329, review granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1069; *People v. Caceres* (2019) 39 Cal.App.5th 917, 928.) Having done so, we reject defendant's *Dueñas* challenge to the restitution fine and other mandatory assessments imposed in this case.[6]

## DISPOSITION

Defendant's conviction in count 9 is vacated and the sentence imposed thereon is stricken, as are the sentences on counts 4 and 5. Defendant's one-year prior prison term enhancements are also stricken. The matter is remanded to trial court for resentencing, during which the trial court is directed to impose and stay full term sentences on counts 4 and 5 pursuant to Penal Code section 654 and impose all mandatory fines and assessments in accordance with the statutes providing therefor. In all other respects, the judgment is affirmed. Following resentencing, the trial court is directed to prepare an

---

[6] The Attorney General also argues the trial court erred in neglecting to impose the court operations and court facilities assessments on defendant's two misdemeanor convictions. Defendant offers no argument in response. These assessments apply to "every conviction for a criminal offense" with exceptions not applicable here. (§ 1465.8, subd. (a)(1); Gov. Code, § 70373, subd. (a)(1).) Because we are already remanding the matter for resentencing, we shall simply direct the trial court to impose all mandatory fines and assessments in accordance with the statutes providing therefor.

amended abstract of judgment and to forward a certified copy thereof to the Department of Corrections and Rehabilitation.

/s/
HOCH, J.

We concur:

/s/
BLEASE, Acting P. J.

/s/
DUARTE, J.