Filed 2/20/24  P. v. Hernandez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C086815 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF140072) |
| v. | |
| JOSEPH KALEIMANU HERNANDEZ et al., | |
| Defendants and Appellants. | |

In 2013, defendants Joseph Kaleimanu Hernandez, Joshua Anthony Givens, and Rakhem Romel Bradford went on a crime spree. Their conspiracy involved burgling residences in Davis, stealing electronic devices and other property from the residences, and selling the stolen property for money. They appeal from their convictions of conspiracy to commit burglary, conspiracy to receive stolen property, multiple counts of first-degree burglary and receiving stolen property, and other crimes.

1

Bradford contends insufficient evidence supports his conviction of conspiracy to commit burglary, as no evidence links him to the actual burglaries.

Bradford and Givens contend the trial court committed prejudicial error by not instructing the jury to determine whether there was one or more than one conspiracy. They argue the remedy is to reverse both of their conspiracy convictions, which in turn would require we reverse their burglary convictions that were based on vicarious liability. Alternatively, they claim we should reverse one of their two conspiracy convictions.

Hernandez asserts that insufficient evidence supports one of his burglary convictions.

Each of the defendants raise various claims of sentencing error. Hernandez also contends that his ineligibility for a youth offender parole hearing due to a strike prior violates his rights to equal protection, and that his sentence constitutes cruel and unusual punishment.

Finding instructional error, we reverse each defendant's conviction of conspiracy to receive stolen property, but not their convictions of conspiracy to commit burglary. We also reverse one of Hernandez's burglary convictions as not supported by substantial evidence. We otherwise affirm the judgments except to remand for a full resentencing for conformance with current sentencing laws.

FACTS AND HISTORY OF THE PROCEEDINGS

The burglary spree occurred from July through December of 2013. We set forth the facts of the burglaries that are relevant to the issues raised on appeal.

1.      Relationship between the defendants

Cell phone and Instagram data indicated that Hernandez and Bradford were associated with one another by late 2012. Givens was associated with the other two by spring of 2013. Beginning in May 2013, Hernandez offered electronic items for sale by text messages. Bradford posted an image of a MacBook computer for sale on Instagram

2

on July 15, 2013. He sold MacBooks and other electronic items on Instagram repeatedly. He also sold MacBook laptops and electronic items on Twitter.

After the burglary spree had begun, Hernandez and Bradford exchanged messages about laptops and their sales. On August 21, 2013, Hernandez texted, "I got 15 and 13 inch 2010." On the same day, Bradford e-mailed, "Wat gig is the iPad?" They exchanged other texts and messages that day about an iPad. Also that day, Bradford posted on Instagram a photo of an iPad and a MacBook laptop for sale.

Hernandez and Bradford exchanged e-mails and texts regarding sales between October 29 and November 1, 2013. Among them was an e-mail on October 31, 2013, where Bradford asked Hernandez, "You unlocked all the Macs." The next day, Bradford e-mailed Hernandez, "You gave Q 50." Hernandez replied to Bradford by text: "I gave you the pad and you getting 50 cuz I was supposed to get 9. And what about the 8 tomorrow how we finna get that? Bro fuckin call me."

### 2. Esther Kwon

Nahyun (Esther) Kwon started school at UC Davis in September of 2011. She met Hernandez in September 2013, and they quickly became friends. Hernandez did not have a car. Kwan had a red Hyundai Sonata. Hernandez asked Kwon for rides "all the time." If they went together and out of town, he would drive. Around town, she would drive. On one trip, they picked up Bradford at his mother's house in Pinole.

Kwon became "so in love" with Hernandez that she "would do anything for him." Hernandez, however, was also dating Summer O. He had relationships with other women during this time period.

### 3. Count 5: 831 Anderson Road

Rui C. lived at 831 Anderson. On July 11, 2013, Rui left home for a class at 7:30 a.m. Her silver 13-inch MacBook Pro laptop was on a counter, and her Canon Rebel T2i camera was by her bed. When Rui returned home around 1:30 p.m., her laptop, her

3

camera, and the camera's strap were missing, as was her roommate's watch. The sliding glass door was unlocked. Rui reported the theft to the police.

Jim Cook, the prosecution's expert witness on wireless technology, testified that at approximately 10:35 a.m. on July 11, 2013, Hernandez's cell phone migrated toward 831 Anderson.

The day after the burglary, pictures of a silver MacBook Pro laptop appeared on Hernandez's iPhone. Hernandez texted pictures of the laptop from his phone as he tried to exchange it for marijuana.

Rui testified that her MacBook looked exactly like the MacBook depicted on Hernandez's phone, except that in those photos and unlike her MacBook, the MacBook's camera was covered by a piece of paper. Rui did not recognize the log-in page depicted on the computer on Hernandez's phone. It did not look like the log-in page that appeared when she turned on her MacBook. The log-in page from the computer on Hernandez's phone appeared when something was stolen and the person used Find my iPhone or Find my iMac app to locate it. Rui did not have or use such an app.

Two weeks later, a photo of a Cannon Rebel T3i camera appeared on Hernandez's phone. In September 2013, additional photos of the Canon T3i camera with its strap around Hernandez's neck appeared on Hernandez's phone. The trial court found there was no evidence and no reasonable inference that the camera Hernandez displayed on his phone was Rui's camera stolen from 831 Anderson.

### 4. Defendants move to 1801 Drexel Drive

Hernandez, Givens, and another person rented a home at 1801 Drexel Drive beginning in September 2013. They paid their rent late and always paid in cash. Kwon was frequently at 1801 Drexel, where she met Givens. Other roommates came and went. Bradford was not on the lease, but he was at the house about three or four times a week and slept in Givens's room.

Hernandez, Givens, and Kwon broke into houses, apartments, and dorms, stole laptops, televisions, video game consoles, watches, and other goods, and brought them to 1801 Drexel. Around 30 TVs went through the house and were sold by the residents, with nine or 10 once being there at one time.

On a number of occasions, Hernandez and Kwon went to the Bay Area to meet up with someone named Dame or Dane to sell the laptops. Hernandez told Kwon he estimated receiving about $500 for each laptop. Hernandez went by the nickname "Macintosh Manu" because he specialized in stealing and selling MacBooks.

Frequently and on random occasions, Hernandez would point out to Kwon houses he had burgled. He often wore gloves and a black beanie when he burgled a house. Kwon also scouted possible burglary locations on her own, and she pitched some of her ideas to Hernandez. Breaking into houses was exciting and thrilling to her. She and Hernandez referred to themselves as Bonnie and Clyde.

5.      Counts 6, 14, and 43:  1708 Drexel Drive

Tyler I., Pete P., and Michael G. lived in a house at 1708 Drexel Drive in the summer and fall of 2013. Tyler's girlfriend, Miranda K., stayed at the house often. The house's backyard backed up to Chestnut Park. One could see into 1708 Drexel's windows from the park. Defendants' residence at 1801 Drexel was across the street.

On August 26, 2013, Tyler had a good friend over for drinks with the roommates. At the end of the night, the friend fell asleep on the living room couch. Tyler locked all of the doors and windows before going to bed. His Samsung television, Xbox video game console, its controllers and games, and his silver 15-inch MacBook Pro laptop were in the living room.

The next morning after waking, Miranda looked into the living room. Tyler's friend was gone, but everything else was there. After showering, Miranda felt that "something was off." She looked into the living room and discovered that the TV, the

5

game console, and the video games were gone. She woke everyone else up, and they discovered that Tyler's MacBook was also missing. The front door was unlocked.

On August 28, 2013, the day after the burglary, Hernandez's phone received a text message from a contact labeled "My Right Hand" that said, "we need more lappies." Hernandez responded, "I know Daym, hit me." On September 1, 2013, Bradford posted a 15-inch MacBook Pro for sale on Instagram.

Later, Givens told Mohamed Husein, a roommate of the defendants at 1801 Drexel, that he and Hernandez had stolen a TV and an Xbox from "across the street" after a party. The TV and the Xbox were stored in Hernandez's room at 1801 Drexel.

The house at 1708 Drexel was burgled a second time. On the night of September 28-29, 2013, Tyler and Michael came home to find the kitchen window open. Tyler's Microsoft Surface tablet was taken, and his gold Nixon wristwatch was missing from his bedroom. Michael's smaller-sized silver MacBook laptop and Pete's Westinghouse television were also missing.

On the evening before the second burglary, September 27, Hernandez texted Givens to "Go check the shit across the street. Go look from tech gate at the park." Givens replied, "Ok." After midnight, Givens texted, "It's a 2013 in a window that's open with the screen on. What do you think?" Hernandez replied, "Do it." That evening, September 28, Hernandez texted to a contact, "Got a TV." The next day, September 29, Hernandez texted someone about trading or selling a Microsoft tablet or a 13-inch MacBook Pro, and "2010."

On September 28, 2013, Bradford posted for sale a Microsoft Windows tablet on Instagram. The next day, Bradford posted a 2010 MacBook Pro for sale.

Once, Hernandez told Kwon he had "robbed" the "neighbor across the street" both "before" and "after" he moved into 1801 Drexel. Givens told Husein he had stolen some watches from the house across the street, including a gold watch. Hernandez frequently wore Tyler's gold watch. Hernandez also showed Kwon a gold watch. Pictures and a

video of Tyler's watch also appeared on Bradford's and Givens's phones between October and December 2013. When Bradford was arrested in December 2013, the arresting officer removed a gold Nixon watch from Bradford's wrist.

6.      Counts 8 and 9:  2734 Albany Avenue

Kofi S., Andrew C., Adam D., and Kasey T. lived in a house at 2734 Albany Avenue. On September 3, 2013, the four roommates left the house in the morning. Andrew returned home at approximately 1:00 p.m. He saw two window screens on the ground in the backyard beneath two open windows. Inside the house, he discovered that his HP laptop and an Xbox console were missing. Kofi discovered that his two MacBook Pro laptops, one white and the other silver, were missing.

Prosecution expert Cook testified that Hernandez's and Givens's phones were in the vicinity of 2734 Albany between approximately 9:00 a.m. and 1:00 p.m. on September 3. By 1:15 p.m., Hernandez's phone had moved away from 2734 Albany.

Late that same morning, Hernandez texted to a contact that he "got a Mackie[.]" Also on September 3, after the burglary had occurred, Bradford advertised a MacBook Pro on Instagram, along with "iPads on the way."

Early the next morning, September 4, a contact asked Hernandez by text, "Can you do 3 and the HP for 12." Hernandez responded, "I'ma come get the white Mackie now." Hernandez planned to meet the buyer at a house at 2809 Albany Avenue, five houses away from where the burglary occurred.

Late on September 4, Hernandez and Givens exchanged text messages about money from the sale of "the Mac and the other laptop." On September 6, Givens tagged Hernandez in an Instagram post of a picture of dozens of $20 and $100 bills. On September 8, Hernandez referenced Bradford when texting another person about the sale of MacBooks and iPads.

2734 Albany was burgled a second time.  On September 10, 2013, Kasey returned home from class and found one of the house's windows was open.  One window screen was on the ground in the backyard.  Inside, Kasey found that $40 in cash and loose change were missing from his bedroom.  Kofi's Play Station 3 and Xbox 360 video game consoles had been taken from the living room.  Adam's old MacBook laptop, which Andrew had borrowed after his laptop was stolen, was missing from Andrew's bedroom.

Cook testified that after 1:30 p.m. on September 10, 2013, Hernandez's and Givens's phones moved to the vicinity of 2734 Albany.  After approximately 2:30 p.m., their phones moved southwest along the route of Interstate 80 and Fairfield.  After 5:00 p.m., Givens's phone was in the Berkeley and Richmond area.  After 5:30 p.m., his phone headed in a northerly direction from El Cerrito through Pinole and Hercules.  By 9:48 p.m., Givens's phone was back in the vicinity of 2734 Albany in Davis.

On September 12, two days after the burglary, Bradford advertised a MacBook Pro laptop for sale on Instagram.  On a later occasion in downtown Davis, Hernandez "pointed out" Kofi to Kwon.  Hernandez told Kwon he had robbed Kofi's house twice and had taken an "expensive gaming console."

7.    Counts 12 and 13:  727 Anderson Road

During the fall of 2013, Kirsten B. lived at 727 Anderson Road.  She owned a silver MacBook Pro with a mint green case.  On the night of September 26, Kirsten left her house to go dancing.  Her laptop and her wallet were on top of her bedroom desk when she left.  She arrived home late and went straight to bed without noticing anything unusual.  The next morning, September 27, she awoke and rushed out the door to get to a 9:00 a.m. class, forgetting to take her laptop.  When she arrived home that evening, the screen on her bedroom window was on the ground, but the window was locked.  Her laptop and wallet were gone.

8

On September 27, 2013, at 9:11 a.m., Hernandez received a text asking if he had "anymore lappys." Hernandez replied he did.

Cook testified that Givens's phone was in the vicinity of 727 Anderson shortly before 1:00 a.m. on September 27. After 2:00 a.m., Hernandez's, Givens's, and Kwon's phones were near each other in downtown Davis.

At 1:12 p.m., September 27, Hernandez received a call from Bradford's phone. At approximately 3:00 p.m., Hernandez's phone was outside Dixon, while Givens's phone remained at 1801 Drexel. Shortly after 4:00 p.m., Hernandez's and Kwon's phones were near El Sobrante and San Pablo. By 5:00 p.m., Kwon's phone was moving in a northeasterly direction near Interstate 80 and Pinole. It returned to Davis by 7:20 p.m.

Approximately one month after the burglary, pictures of Kirsten's MacBook Pro laptop with a mint green case appeared on Bradford's phone.

8. Counts 7 and 15: 1727 Pomona Drive

In the late summer and fall of 2013, Elizabeth O., Austin T., and Mary G. lived in a house at 1727 Pomona Drive. On the morning of August 30, Elizabeth noticed that her MacBook Pro laptop with a green sticker, her Nexus tablet, and her purse had been stolen from the living room during the night. Austin's Samsung television had also been taken from the living room. The front door was unlocked when Elizabeth had gone to bed.

Cook testified that Hernandez's phone was in the vicinity of 1727 Pomona from before midnight, August 29, to 12:30 a.m., August 30. Hernandez's phone was in the vicinity of 1727 Pomona also at approximately 2:00 a.m. Givens's phone began using the cell site nearest 1727 Pomona for a few minutes, beginning at approximately 4:30 a.m. Hernandez's phone remained near 1727 Pomona through 4:45 a.m.

On September 1, 2013, two days after the burglary, Hernandez, referring to himself as "Macintosh Manu," offered to sell "like MacBook Pro and an iPad" via text

9

messages.  On the same day, Bradford advertised a MacBook Pro and an iPad for sale on Instagram.

On September 30, 2013, another burglary occurred at 1727 Pomona.  Elizabeth had worked a night shift.  She arrived home between 6:30 a.m. and 7:30 a.m., and she closed and locked the front door before going to bed.  When she awoke around 11:30 a.m. or 12:30 p.m., she saw that the door was wide open.  Mary came home from class while Elizabeth was sleeping and found that her silver MacBook Air laptop had been taken from her bedroom.  Austin left the house that morning at approximately 6:00 a.m.  When he returned around noon, he found a large kitchen knife he owned lying on the front porch and saw that the door was open.  His skateboard had been taken from the living room.

Soon after 6:30 a.m. on September 30, 2013, Kwon messaged Hernandez that she wanted "to drive around in the morning to see who leaves their house for class."  Shortly after 9:00 a.m., Kwon and Hernandez agreed "to go."  As they were driving around, Hernandez told Kwon to go to "this house," as he had "hit them before."  When Kwon, Hernandez, and Hernandez's cousin Patrick approached the house "during the day," the front door "was left open."  The three went inside.  Kwon took a skateboard from the living room.  Patrick grabbed a MacBook Pro.  They were in and out of the house in less than two minutes.

Two days after the burglary, Bradford advertised a MacBook Air laptop for sale on Instagram.

9.    Count 19:  1660 Drew Circle

In the fall quarter of 2013, Kristina G. and Wenyan L. lived in an apartment at the Sharps and Flats apartment complex at 1600 Drew Circle.  Around 11:00 p.m. on October 10, 2013, the roommates went into downtown Davis.  They returned home at approximately 2:00 a.m. the next morning, October 11.  Kristina noticed that all of the

10

lights in the apartment were on, but only one light was on when they had left. She also saw that a window was wide open, and its screen had been ripped off and thrown into some bushes.

Inside the apartment, Kristina discovered that two wallets, a backpack containing a Chromebook laptop, and another laptop all belonging to her were missing. Wenyan discovered that her MacBook Pro, her Nexus tablet, and her backpack containing schoolbooks and items were gone.

Cook opined that a few minutes before and after midnight on October 10-11, 2013, Hernandez's phone could have been in the vicinity of 1660 Drew Circle. Kwon's phone was likely in the same vicinity at 12:06 a.m. Hernandez's phone remained in the vicinity of 1660 Drew Circle at 15 and 20 minutes after midnight and from 1:40 a.m. through 2:05 a.m.

Kwon testified that she, Hernandez, and Bradford participated in the burglary at the Sharps and Flats apartments. The three were together when around 2:00 a.m., Hernandez proposed they steal some things. It was Kwon's idea to go to Sharps & Flats. Kwon drove them there in her car. Bradford was drunk and asleep in the back seat. Kwon parked the car, and she and Hernandez walked toward a building with an open window.

A man came out of the apartment facing the one with the open window, and he was smoking. Hernandez told Kwon to talk with the man. She and the man talked and smoked while Hernandez went back to the car. When Kwon rejoined him, Hernandez told Bradford to get out of the car and stand in the parking lot. Bradford got out of the car and stood in the lot, but then he went back into the car and slept again.

Hernandez and Kwon went back to the apartment with the cracked window. Hernandez wiggled the screen open, opened the rest of the window, and then hopped in and opened the front door for Kwon. Both of them looked for things to grab. Kwon took a laptop and a bag or purse that had lipstick, a wallet, and an ID card inside. Hernandez

11

grabbed a dark-colored backpack.  Kwon later saw three laptops inside the backpack.

She also threw the purse away.  Hernandez later gave the backpack and its laptops to his

father in the Bay Area.

        10.     Counts 20, 21, and 22:  502 Oeste Drive and 621 Russell Boulevard

        During fall quarter of 2013, Ryan P. lived in a duplex at 502 Oeste Drive.

Keith R. lived in the duplex's other unit, which was at 621 Russell Boulevard.  On

October 10, 2013, Ryan, Keith, and their roommates went out at approximately 9:30 p.m.

and returned home at approximately 1:30 a.m. October 11.

        When they left, Ryan's MacBook Pro was on the sofa in his living room, and

Keith's laptop was inside a backpack on his living room couch.  When Ryan awoke the

next morning, it was cold in the house, and he saw that the front door was open.  His

laptop was missing from the living room.  When Keith awoke, he noticed that his front

door was open, and a video console's tray was open with no disk in it.  Minutes later,

Ryan arrived at Keith's and said his laptop had been stolen.  Keith looked and discovered

his laptop, a backpack, and a video game were missing.

        Cook opined that Hernandez's phone moved toward the duplex at 502 Oeste/621

Russell at approximately 2:00 a.m. October 11.  It then moved north by 2:20 a.m.

Givens's phone was at his residence at 1801 Drexel until it moved toward the duplex at

approximately 2:30 a.m.  After 2:30 a.m., Hernandez's and Givens's phones were near

each other in downtown Davis.  A few minutes later, Givens's phone returned to near

1801 Drexel, and Hernandez's phone went further north.  Hernandez's phone was again

in the vicinity of the duplex shortly before 3:30 a.m.

        In the evening of October 11 after the burglary, Hernandez's phone received a text

asking to let the texter know "if u know anybody who got a mac boot up cd for that other

one."  On October 28, 2013, Bradford posted two MacBooks for sale on Instagram.

11.    Count 25:  1213 Alvarado Drive

During fall quarter of 2013, Larry O., Karim O., and George C. lived at 1213 Alvarado Drive in the Fountain Circle Townhomes complex.  During the night of October 13, 2013, Karim and George left the townhome to get food.  They locked the front door when they left.  Larry was in his bedroom upstairs doing homework.  His bedroom door was shut, and he was wearing noise-cancelling headphones listening to music while he did his homework.

When the roommates returned home, they discovered the front door had been kicked in.  The door was off its frame, and the wooden frame was frayed at the lock. Karim noticed that his silver MacBook was missing from the living room couch, and a second older MacBook laptop was missing from his upstairs room.  George's MacBook Pro laptop, iPhone 4, and his backpack with a textbook were missing from the kitchen.

Kwon testified that she and Hernandez had walked around outside the apartment, looked inside, and saw no one there.  Hernandez rammed his body into the front door and broke it down.  They both went inside, and Hernandez directed Kwon to go upstairs, which she did.  She opened a bedroom door and saw a man sitting at a desk in front of a computer wearing large headphones that covered all of his ears.  The two briefly made eye contact, and then Kwon ran downstairs and out the door, telling Hernandez there was someone upstairs.  They both got in her car and drove back to 1801 Drexel.

Early on October 13, Hernandez had texted Givens, "1213 Alvarado Avenue." That evening, Givens responded, "Okay."  Hernandez replied, "Check the perimeter." Cook opined that Hernandez's and Kwon's phones were near each other north of UC Davis after 10:00 p.m. on October 13.  Roughly an hour later, Hernandez's phone was in the vicinity of downtown Davis.  At approximately 11:45 p.m., his phone moved from the vicinity of 1213 Alvarado toward 1801 Drexel.  Givens's phone remained in the vicinity of 1801 Drexel the entire night.

13

The afternoon after the burglary, Hernandez and Bradford texted each other about exchanging a laptop for drugs. That same afternoon, Bradford posted on Instagram a photo of a number of MacBooks, an iPhone, other phones, and a backpack for sale. Early on October 15, 2013, Givens texted Hernandez about his "stuff" and said they needed "to hit Benicia." Later that same day, Givens asked Hernandez by text, "You trying to start selling this stuff? L-o-l, I just started."

Months later, police e-mailed George a photo of his laptop, phone, and backpack taken from Bradford's phone.

### 12. Count 32: 2808 Sycamore Lane

During fall 2013, Roderic V. lived at 2808 Sycamore Lane. In the early morning of October 25, 2013, Roderic left his silver 13-inch MacBook Pro laptop on the couch in the house's common area. When he awoke, his laptop was gone. The front door had been unlocked when he and his roommates when to bed.

Cook opined that Hernandez's phone was in downtown Davis beginning at 11:00 p.m. October 24, 2013. Reviewing GPS data, Cook opined that Bradford's phone was also in downtown Davis after 11:00 p.m. on October 24 and at 12:42 a.m. on October 25.

On October 26, Bradford texted Kwon saying that, "last night I was stranded. I had to drop the shit I had." When Kwon asked where, Bradford responded, "At like two downtown. I had a Mackie." On a different occasion, Hernandez pointed out to Kwon a house on Sycamore Lane he had burgled.

### 13. Dorm burglaries and law enforcement investigation

On October 5, 2013, Kwon texted Hernandez that "the dorms were full of PCs." Using the student identification card of a resident, Bernadette G., the pair gained access to the Cuarto Residence Halls in the middle of the night. They checked doors and windows looking for MacBooks. If they found an open door, they would walk in, grab whatever they could, and leave.

14

Surveillance videos from the early morning hours of October 16 and 17 depicted Kwon and Hernandez walking through Cuarto. Former students testified of having their laptops stolen on those nights along with other items such as backpacks, wallets, and a TV.

Cook opined that Kwon's phone was in the vicinity of Cuarto on October 16, 2013, at approximately 3:00 a.m. Hers and Hernandez's phones were in the vicinity of Cuarto after 11:15 a.m. that morning. Cook also opined that on October 17, Hernandez's phone was shut off between approximately 2:00 a.m. and 7:00 a.m. But Kwon's phone was in the vicinity of Cuarto during that time.

Investigating the thefts, Detective Kevin Skaife of the UC Davis Police Department made a surprise visit to Bernadette's dorm room in Cuarto on October 22, 2013. With information from Bernadette and from the university, Detective Skaife identified Kwon as a suspect. He also identified Hernandez and Kwon as the people in the surveillance videos.

Kwon learned about UC Davis's investigation from Bernadette. Kwon told Hernandez. Kwon was not a United States citizen, and she and Hernandez planned to marry in part to keep her from being deported. Kwon also wanted to marry him because she loved him. Kwon discussed her marriage plans with Bradford.

On October 23, 2013, Hernandez and Bradford exchanged messages about Kwon. Hernandez's brother, "Bubba," who was living at 1801 Drexel, complained about Kwon. Bradford wrote, "Bro, we need to keep Esther between me and you anyway. We got a foreign bitch unda full control. [¶] . . . [¶] We gotta make her think I really love her so you can keep yo bitches tamed lol."

On November 5, 2013, Detective Skaife contacted Kwon to schedule an interview. They agreed to meet the following day. Kwon told Hernandez about the scheduled meeting, and he told her to deny everything and not to bring him up. Bradford and Hernandez exchanged messages about what Kwon should say in the interview.

15

At the interview on November 6, Kwon initially denied any involvement in the dormitory burglaries. She later said she had been walking around the dorms with a subject named Jeremy, and she saw him steal a laptop charger. After the interview, Detective Skaife authored a search warrant for Kwon's cell phone and call detail records for her account. The next day, November 7, he met with Kwon, served the warrant, and seized her cell phone. He subsequently extracted data from the phone, including messages, call records, and photographs, and including data that had been "deleted."

Meanwhile, beginning on November 6, 2013, Bradford and Kwon exchanged multiple messages in which Bradford expressed romantic feelings toward Kwon. Kwon explained why she loved Hernandez but also that Bradford "could be the one" for her.

Sometime after meeting with Detective Skaife, Kwon was with Hernandez in his room. Hernandez showed her his shotgun and told her that people who rat are going to get what's coming to them. Photographs on Hernandez's cell phone taken in October 2013 depicted him with a sawed-off shotgun.

14.    Counts 33, 34, and 35:  1513 and 1517 Anderson Road

Joseph W., the resident of a duplex unit at 1517 Anderson Road grew medicinal marijuana in his house. Hannah and Jeffrey C. and their two children lived in the duplex's other unit at 1513 Anderson Road.

On December 6, 2013, Givens texted Hernandez about doing "the big one tonight or tomorrow," and he mentioned Bradford. The next morning, Kwon, Hernandez, and Givens went in Kwon's car to break into "a drug dealer's house, Joey."

David B. lived across the street from the duplex at 1517/1513 Anderson. On December 7, 2013, he was outside his house when he saw two men walk by. Both were wearing black beanie caps on a Sunday at noon, and they were looking in circles and all directions. The two crossed the street. While one stood on the curb, the other went in the side gate of the half-plex and disappeared behind the house. David called 911.

16

As David spoke with the dispatcher, the man who had gone through the gate came out from behind the house. One of the men broke the door in at Joseph's house with his shoulder, and both men went inside. As the two men entered, David noticed a woman standing on the curb in front of the half-plex. It was Kwon.

One man came out of Joseph's home carrying a television. The other man came out of the C.s' home carrying bags. The two men and the woman quickly walked away. Hernandez carried a "giant" green or blue plastic bin to Kwon's car and put the bin in the trunk. The three got into the car, and Kwon drove them straight to 1801 Drexel.

Minutes after the burglary, police officers and the duplex's residents arrived at the scene. Joseph's front door appeared to have been kicked in and part of the frame or doorjamb was cracked. His grow room "had been trashed." A large steel case and a green tub that both contained harvested marijuana were missing.

The C.s' rear sliding door was open. Their living room couch had footprints on it, and a large postal box of Christmas presents that had been on the coffee table was missing. Police found the missing box in the backyard. The box had been ripped open.

Back at 1801 Drexel, Hernandez and Givens unloaded the bin. It contained "[a] lot of marijuana." Later that night, a photo of marijuana on a cardboard box appeared on Givens's phone. Givens's phone also contained a video depicting Bradford lying on a bed in Givens's bedroom counting money. The same video appeared on Bradford's phone the following night, December 8, along with other photos of cash and bags of marijuana. On December 10, Givens texted Hernandez that Hernandez, Bradford, and Hernandez's brother "can sell that shit" and that Givens did not "want a cut."

David identified Kwon and Hernandez in photo lineups.

15.     Counts 38 and 39:  1112 Chestnut Lane

In fall 2013, Anthony F., Daniel K., and Matthew S., members of the UC Davis cycling team, lived in a house at 1112 Chestnut Lane. During finals week, a man came to

17

the door and told Daniel K. they were going to be having a party that night and not to mind the noise. There was no party or noise that night.

On December 16, 2013, Anthony returned home from work at about 5:30 a.m. and saw that all the lights inside the house were on. That surprised him because they were off when he left, and all his roommates had left for winter break. The sliding glass door in his bedroom was open, and all of the bedrooms were disheveled.

Anthony discovered that his Felt carbon fiber road bicycle and Matthew's carbon Cervélo S5 road bicycle were missing from the garage. A Canon 40D digital camera and its lens, jewelry he had recently purchased, a duffel bag, some currency, and a Brinks home safe with $200 cash were missing from Anthony's bedroom. A blue Canon Powershot camera and some money were taken from Anthony's room. The thieves took from Matthew's room a wall-mounted computer monitor, a microphone, an iPod Nano, prescription bottles, and a bag containing an airsoft rifle.

Shortly after 3:00 a.m. on the morning of the burglary, a photograph of Matthew's airsoft rifle appeared on Givens's phone.

16.     Counts 40 and 41:  753 Anderson Road

In fall 2013, Daniel R. and Chase H. lived with other roommates in a house at 753 Anderson Road. Before leaving the house for winter break, Daniel R., who was the last roommate to leave, locked all the doors and closed the windows. Three days later, on December 19, Daniel R. and Chase stopped by the house on their way to Tahoe. The front door was unlocked. The back sliding glass door and the kitchen window were open. Bedroom doors had been kicked in. Daniel R.'s bedroom drawers had been rifled through, and two watches were missing from his dresser's top drawer. One of his watches was a Nixon with a leather band.

Chase had left his silver MacBook Pro under his mattress before he left for break. He discovered the laptop had been taken. He was also missing a black backpack, a

18

graphing calculator, a pocketknife, medication, and two watches. One watch was a fake Rolex with a blue face and silver band. Other roommates were missing televisions.

Beginning December 16, Bradford and another person exchanged text messages about a broken laptop. On December 19, Bradford asked the same contact, "you still need a MacBook?" On December 20, Bradford posted a 13-inch MacBook for sale.

Cook opined that on December 19 at 4:35 a.m., Hernandez's phone was in the vicinity of 753 Anderson. Afterward, the phone was shut off until almost 1:30 p.m. when it was in the vicinity of an apartment at 3030 Cowell Boulevard.

17.    Counts 42 and 43:  611 Russell Boulevard

During fall quarter 2013, Samuel S. lived with two roommates in a duplex at 611 Russell Boulevard. When Samuel returned to the house after winter break on January 3, 2014, he noticed signs of a break-in. He realized his bedroom door, which he had locked before leaving for the break, was unlocked. Inside his bedroom, he saw that his window was broken, and its screen was on the floor. His Westinghouse television that had been mounted on the wall, some watches, and an older MacBook Pro laptop were missing. Samuel later met with police and identified his missing television.

18.    Search warrants

Davis police officers executed a search warrant at 1801 Drexel on December 19, 2013. Givens, Bradford, and other roommates were present. Bradford was wearing Tyler's gold Nixon Watch. Bradford's phone was found on top of a TV stand. In Givens and Bradford's bedroom, officers found Joseph's green plastic tub of marijuana, scales, Matthew's prescription bottle, and two airsoft guns, one of which belonged to Matthew. Givens and Bradford were arrested.

Officers also found Tyler's Xbox game and controllers along with other consoles, games, and DVDs. They found Matthew's silver iPod Nano, Daniel K.'s blue Canon camera, and Anthony's Hewlett Packard laptop and his black Skagen watch.

19

Also on December 19, 2013, officers executed a search warrant at 3030 Cowell Boulevard. Hernandez and his girlfriend, Summer, answered the door. Documents identifying Hernandez were found in one of the bedrooms. Officers found Chase's silver MacBook Pro laptop and his prescription bottle, and bags of marijuana. Hernandez was arrested.

On January 3, 2014, officers executed a search warrant at an apartment at 1659 Drew Circle where Hernandez lived. He and Summer were present, and Hernandez was taken into custody. Officers found, among other items, Samuel's Westinghouse television, another victim's checkbook, and Chase's Nixon watch with a brown leather strap.

After Hernandez's arrest, Bradford continued to advertise electronics for sale on Instagram, but he stopped selling MacBook laptops.

19.    <u>Verdicts</u> <u>and</u> <u>sentences</u>

A jury found Hernandez guilty of conspiracy to commit burglary (count 1); conspiracy to receive stolen property (count 2); 28 counts of first-degree burglary (including counts 5, 8-9, 12, 7 & 15, 19, 20-21, 25, and 42) with true findings that the residences were occupied in 14 of those burglaries, seven counts of receipt of stolen property more than $950 in value (including counts 13, 22, and 43); possession of a firearm with a felony prior, prohibited ammunition possession; and misdemeanor possession of marijuana for sale. (Pen. Code, §§ 182, subd. (a)(1); 459; 459/667.5, subd. (c); 496, subd. (a); 29800, subd. (a); 30305, subd. (a); Health & Saf. Code, § 11359, sub. (b).) (Statutory section citations that follow are found in the Penal Code unless otherwise stated.) In a bifurcated court trial, the trial court found true that Hernandez had a prior strike and a prior serious felony conviction. (§§ 667, subds. (a)(1), (b)-(i); 1170.12.)

After denying Hernandez's *Romero*[1] motion to strike his strike prior, the trial court sentenced Hernandez to an aggregate prison term of 93 years: the upper term of six years on the first-degree burglary conviction in count 6; 27 consecutive terms of 16 months (one-third the middle term) on the remaining first-degree burglary convictions; a consecutive term of eight months (one-third the middle term) for the firearm possession; a consecutive term of eight months (one-third the middle term) for the ammunition possession, totaling 43 years 4 months, doubled for the strike prior to 86 years 8 months, plus a five-year serious felony prior enhancement; and a consecutive term of 16 months (one-third the middle term) for an additional first-degree burglary in case No. 10-3244 following Hernandez's probation violation. The court imposed a concurrent jail term of 180 days for the marijuana possession. The court stayed upper terms of six years and three years on the conspiracy convictions in counts 1 and 2, respectively, pursuant to section 654. It also stayed upper terms of three years for the receipt of stolen property convictions pursuant to section 654.

The jury found Bradford guilty of two counts of conspiracy (counts 1 and 2); eight counts of first-degree burglary (counts 8-9, 7 & 15, 19, 20-21, and 42) with true findings that the residences were occupied in five of those burglaries; seven counts of receipt of stolen property more than $950 in value (including counts 13, 22, and 43); and misdemeanor possession of marijuana for sale. (§§ 182, subd. (a)(1); 459; 459/667.5, subd. (c); 496, subd. (a); Health & Saf. Code, § 11359, sub. (b).)

The trial court sentenced Bradford to an aggregate prison term of 13 years four months: the lower term of two years on the first-degree burglary conviction in count 7; seven consecutive terms of 16 months (one-third the middle term) for the remaining burglary counts; and three consecutive terms of eight months (one-third the middle term)

---

[1]    *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

21

for three of the receipt of stolen property convictions (counts 13, 24, 35). The court imposed concurrent lower terms of 16 months on the remaining receipt of stolen property convictions, and a concurrent jail term of 180 days for the marijuana conviction. The court imposed lower terms of two years and 16 months on the conspiracy convictions in counts 1 and 2, respectfully, and then stayed them pursuant to section 654.

The jury found Givens guilty of two counts of conspiracy (counts 1 and 2); 16 counts of first-degree burglary (including counts 8-9, 12, 7 & 15, 19, 20-21, 25, 42) with true findings that the residences were occupied in nine of those burglaries; four counts of receipt of stolen property more than $950 in value (including count 43); and misdemeanor possession of marijuana for sale. (§§ 182, subd. (a)(1); 459; 459/667.5, subd. (c); 496, subd. (a); Health & Saf. Code, § 11359, sub. (b).)

The trial court sentenced Givens to an aggregate prison term of 19 years four months: the lower term of two years for the burglary conviction in count 6; 13 consecutive terms of 16 months (one-third the middle term) on 13 of the remaining burglary convictions; concurrent lower terms of two years each for the burglary convictions in counts 21 and 34; and a concurrent jail term of 180 days for the marijuana conviction. The court imposed the lower terms of two years and 16 months for the conspiracy convictions in counts 1 and 2, and it stayed them pursuant to section 654. It imposed lower terms of 16 months for each of the receipt of stolen property convictions, and it stayed execution under section 654.

All defendants filed timely notices of appeal.

## DISCUSSION

### I

*Bradford's Conviction of Conspiracy to Commit Burglary (Count 1)*

Conspiracy is essentially an agreement by two or more persons to commit an unlawful act. (*People v. Ware* (2022) 14 Cal.5th 151, 163 (*Ware*).) The crime has four

elements: "(1) the existence of an agreement between at least two persons; (2) the specific intent to agree to commit an offense; (3) the specific intent to commit the offense that is the object of the agreement; and (4) an overt act in furtherance of the conspiracy, which may be committed by any conspirator." (*Ibid*., § 182, subd. (a)(1).)  The existence of an agreement "is the crux" of criminal conspiracy.  (*People v. Homick* (2012) 55 Cal.4th 816, 870.)

Bradford contends that insufficient evidence supports his conviction of conspiracy to commit burglary.  He claims there is no evidence he entered into an agreement to commit burglary.  He asserts there is no evidence he planned any of the burglaries or was personally involved with them, nor is there evidence he agreed to commit burglary in advance of any or all of them.  He argues that circumstantial evidence shows only that he fenced property stolen by others.  He admits he knew the property he received from others was stolen, but that knowledge, he argues, is not substantial evidence that he agreed to commit the crime of burglary.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]  We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]  In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)

" ' "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a

determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" [Citation.] A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

Evidence is sufficient to prove a conspiracy to commit a crime " 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135, abrogated on another ground in *People v. Leon* (2020) 8 Cal.5th 831, 848.) "[T]he existence and nature of the relationship among the conspirators is undoubtedly relevant to whether such agreement was formed, particularly since such agreement must often be proved circumstantially. ' "The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." ' " (*People v. Homick, supra*, 55 Cal.4th at p. 870, italics omitted.) As a result, "it is not necessary for the prosecution to prove the alleged conspirators made an express or formal agreement or that they ever met." (*People v. Austin* (1994) 23 Cal.App.4th 1596, 1606, disapproved on another ground in *People v. Palmer* (2001) 24 Cal.4th 856, 861, 867.) "The agreement may be inferred from the conduct of the defendants mutually carrying out a common purpose in violation of a penal statute." (*People v. Lipinski* (1976) 65 Cal.App.3d 566, 575.)

A conspirator does not have to participate in the conspired crime. (*People v. Malotte* (1956) 46 Cal.2d 59, 65.) "Each party to a conspiracy is criminally responsible for all acts done in furtherance of the conspiratorial design. [Citations.] In legal contemplation, 'the act of one is the act of all.' (*People v. Kauffman* (1907) 152 Cal. 331, 334 [].) In a concerted criminal venture, each party is equally culpable and should suffer the same consequences." (*People v. Nance* (1960) 181 Cal.App.2d 147, 150-151

24

[defendant who did not participate in burglary was liable for conspiracy to commit burglary for agreeing to help dispose of the stolen goods].)

The prosecution must establish that the defendant "had the specific intent both to agree to the conspiracy and to commit the object offense." (*Ware, supra*, 14 Cal.5th at p. 164.) To establish the requisite specific intent, the prosecution must show that the defendant "intended to play some part in achieving the conspirator's unlawful ends. Put differently, '[t]here must be something more than "[m]ere knowledge, approval of or acquiescence in the object or the purpose of the conspiracy." ' " (*Id*. at p. 166.)

There is no direct evidence that Bradford entered into an agreement with the other defendants to commit burglary. Thus, the issue before us is whether there is substantial circumstantial evidence from which a rational juror could reasonably infer that Bradford entered into an agreement to commit burglary, and whether he specifically intended to agree to the conspiracy and to commit burglary.

Substantial evidence supports the jury's determination that Bradford entered into an agreement with Hernandez and Givens to commit burglary. Any rational juror hearing the evidence could have made that determination beyond a reasonable doubt. Contrary to Bradford's argument, there was at least one burglary about which the jurors could conclude Bradford participated in and committed an overt act in furtherance of a conspiracy to commit burglary. Bradford was with Hernandez and Kwon when they burgled 1660 Drew Circle. Hernandez told Bradford to get out of the car and stand in the parking lot. Bradford complied and stood in the parking lot for a while before getting back in the car and falling asleep. The jury could reasonably conclude that in this instance, Bradford specifically agreed to the conspiracy and to the burglary, and his accompanying Hernandez and Kwon and standing in the parking lot at Hernandez's order was an overt act in furtherance of the conspiracy.

The jury could also infer from all the circumstantial evidence that Bradford had the specific intent to agree to the conspiracy and to commit burglary. Jurors could infer

25

this in part from the numerous times Bradford consistently posted stolen items for sale quickly after Hernandez had stolen them. This happened so regularly that the jury could conclude that Bradford agreed with Hernandez to commit burglary so he could sell the stolen goods. Hernandez and Givens stole a 15-inch MacBook Pro from 1708 Drexel. Five days later, Bradford posted a 15-inch MacBook Pro for sale on Instagram. Hernandez stole two MacBook Pros and an HP laptop from 2734 Albany. After the burglary but on the same day, Bradford advertised a MacBook Pro on Instagram.

Hernandez stole a MacBook Pro with a mint green case from 727 Anderson. Approximately one month later, that same MacBook Pro with its mint green case appeared on Bradford's phone. Hernandez stole a MacBook Pro and a Nexus tablet from 1727 Pomona. Two days later, Bradford advertised a MacBook Pro and an iPad for sale on Instagram. A month later, Hernandez stole a MacBook Air laptop from 1727 Pomona. Two days after that burglary, Bradford advertised a MacBook Air laptop for sale on Instagram.

Hernandez stole a MacBook Pro and two other laptops from 502 Oeste/621 Russell. Seventeen days later, Bradford posted two MacBooks for sale on Instagram. Hernandez stole three MacBooks, an iPhone, and a backpack from 1213 Alvarado. That same afternoon, Bradford posted on Instagram a photo of a number of MacBooks, an iPhone, other phones, and a backpack for sale. Hernandez stole two watches and a MacBook Pro from 753 Anderson. The next day, Bradford posted a 13-inch MacBook for sale. The jury could reasonably infer from such consistent cooperation that Hernandez and Bradford agreed to commit burglary to sell stolen property.

Some of Bradford's communications provide further evidence from which the jury could infer an agreement and specific intent to commit burglary. Bradford told Kwon that on the previous night, he had been in downtown Davis at 2:00 a.m. with "a Mackie" he was trying "to drop" within hours after Hernandez stole a MacBook Pro from 2808 Sycamore. Days later, Bradford asked Hernandez, "You unlocked all the Macs." The

26

next day, Bradford e-mailed Hernandez, "You gave Q 50." Hernandez replied to Bradford by text: "I gave you the pad and you getting 50 cuz I was supposed to get 9. And what about the 8 tomorrow how we finna get that? Bro fuckin call me." The jury could infer from these communications that Bradford's relationship with Hernandez was more than simply being aware of the burglaries. The two were in a business relationship, and the sharing of profits required Hernandez to steal MacBooks and other laptops for Bradford to sell. The jury could infer from Bradford asking Hernandez if he had unlocked the Macs he had stolen and from Hernandez asking Bradford to call him to discuss something for the next day that Bradford had agreed to the conspiracy to burgle homes.

Hernandez's and Bradford's living circumstances also support a specific intent to commit burglary. Bradford lived at least part time at 1801 Drexel with Hernandez and Givens. Bradford lived among the stolen property that cycled through the house, including through the bedroom he shared with Givens. Indeed, on the day Hernandez and Givens stole a significant amount of marijuana from 1517 Anderson, Givens's phone contained a video depicting Bradford lying on a bed in Givens's bedroom counting money. The same video appeared on Bradford's phone the following night along with other photos of cash and bags of marijuana. The jury could infer from these videos in their context at 1801 Drexel that Hernandez, Givens, and Bradford were each part of the conspiracy to burgle the home to get marijuana to sell.

Bradford relies on *Ware, supra*, 14 Cal.5th 151, to argue that his benefiting from the conspiracy between Hernandez, Givens, and Kwon to commit burglary, or even his encouragement of those burglaries, did not make him a coconspirator. *Ware* is distinguishable.

The defendant in *Ware* was a gang member convicted of conspiracy to commit murder stemming from a gang rivalry. The prosecution presented no evidence that the defendant had either committed or aided and abetted any act of violence. Instead, to

27

establish a conspiracy, the prosecution relied on the defendant's gang membership, his access to a gun on at least one occasion during the two-year-long conspiracy, his social media posts celebrating violence against rival gangs, and evidence of his involvement in a shooting. The evidence from the shooting consisted of photos of him and other gang members taken before and about a mile from where the shooting occurred, messages the defendant sent to the victim to dissuade her from testifying against the driver of the car from which the shot was fired, and a Facebook post by the defendant calling out the driver for talking with the police. (*Ware, supra*, 14 Cal.5th at pp. 156-161.)

The California Supreme Court held that this evidence was insufficient to establish a conspiracy to commit murder. As we have quoted above, the court declared that the prosecution must show that a defendant intended to play a role in the conspiracy. The court stated, "To establish the requisite specific intent connecting an individual defendant to the charged conspiracy, the prosecution must show that the defendant intended to play some part in achieving the conspirator's unlawful ends. Put differently, '[t]here must be something more than "[m]ere knowledge, approval of or acquiescence in the object or the purpose of the conspiracy." ' [Citations.] A cheerleader, no matter how enthusiastic, is not a coconspirator unless the prosecution can prove the cheering was intended to play some role in achieving the object offense. Likewise, a member of a group may receive some benefit from others' misdeeds, but without more, a mere beneficiary is not a coconspirator. Unlike a Penal Code section 182.5 gang conspiracy charge, in which knowingly benefiting from the conspiracy is a basis for liability, a Penal Code section 182 traditional conspiracy requires the prosecution to demonstrate that the individual defendant intended to play a role in the object offense, not merely profit from it after the fact." (*Ware, supra*, 14 Cal.5th at p. 166.)

The evidence in *Ware* showed only that the defendant was an active gang member, had access to guns at some point during the conspiracy, tried to help the driver after his arrest for the shooting, and voiced his support for violence against rival gangs. (*Ware,*

28

*supra*, 14 Cal.5th at p. 168.)  The court held, "Considering the evidence as a whole, we conclude that no reasonable jury could have found beyond a reasonable doubt that [the defendant] had the requisite intent to participate in a conspiracy to commit murder." (*Ibid*.)

In contrast to the defendant in *Ware*, Bradford was not a mere cheerleader.  He did not merely encourage or benefit from the burglaries.  The jury could reasonably infer from the evidence we have described that Bradford agreed to the conspiracy and to committing burglary so that everyone in the conspiracy could profit.  He was present at one burglary, as if acting as a lookout for a short time.  And his habitual posting of items for sale quickly after Hernandez had stolen them and his communications with Hernandez reasonably implied to the jury the existence of an agreement between them to commit both burglary and receipt of stolen property.  Substantial evidence thus supports Bradford's conviction under count 1 of conspiracy to commit burglary.

II

*Lack of Jury Instruction on Number of Conspiracies (Counts 1 and 2)*

Although a split of authority exists, the more recent authority holds that the number of conspiracies committed is a question of fact, and where the evidence supports alternate findings of one or more than one conspiracy, a trial court must instruct the jury sua sponte to determine the number of conspiracies.  (*People v. Kopp* (2019) 38 Cal.App.5th 47, 85, review granted on another issue Nov. 13, 2019, S257844 (*Kopp*); *People v. Meneses* (2008) 165 Cal.App.4th 1648, 1668-1671; *People v. Jasso* (2006) 142 Cal.App.4th 1213, 1220-1223 (*Jasso*); cf. *People v. Liu* (1996) 46 Cal.App.4th 1119, 1133; *People v. McLead* (1990) 225 Cal.App.3d 906, 921.)

Bradford and Givens contend, and the Attorney General concedes in supplemental briefing, that the trial court erred by not instructing the jury to determine whether there was one or more than one conspiracy.  Although defendants were charged and convicted

29

of committing two separate conspiracies, the evidence supports an alternate finding they committed only one conspiracy—an agreement to commit residential burglaries to obtain property to sell for money—and the trial court bore a duty to direct the jury to determine whether defendants committed one or more than one conspiracy.

Defendants argue and the Attorney General also concedes that the error was prejudicial under the *Watson* standard of prejudice.[2]  If the jury had been correctly instructed, it is reasonably probable defendants would have received a more favorable verdict.  (Because the parties agree the error was prejudicial under *Watson*, we need not address Givens's argument that the error is prejudicial under the *Chapman* standard.[3])  Although Hernandez did not raise this argument, his conspiracy convictions suffer from the same error.

The parties disagree on the proper remedy.  Defendants contend that both of their conspiracy convictions must be reversed.  They further argue that because both of their conspiracy convictions must be reversed, each of their burglary convictions that were based on vicarious liability must also be reversed.  Those convictions for Bradford are counts 7, 8, 9, 15, 19, 20, 21, and 42, and for Givens counts 7, 8, 9, 12, 15, 19, 20, 21, and 25.

Alternatively, defendants argue that one of their conspiracy convictions must be reversed, as the evidence was insufficient to support two conspiracies.  Bradford argues that under this theory, his conviction under count 1, conspiracy to commit burglary, must be reversed.  He asserts that no substantial evidence supports that conviction against him, and count 2, conspiracy to receive stolen property, is more commensurate with his

---

[2]     *People v. Watson* (1956) 46 Cal.2d 818, 836.

[3]     *Chapman v. California* (1967) 386 U.S. 18, 24.

culpability. Givens contends his conviction under count 2 must be reversed, as count 1 was more commensurate with his culpability.

The Attorney General argues that under our discretion to reverse, affirm, or modify a judgment, we should affirm the conspiracy convictions in count 1 and strike the convictions in count 2 for each of the defendants. Because the jury convicted on both counts, had the information charged only a single conspiracy, the jury would have found defendants guilty of a single conspiracy to commit first degree burglary and receive and sell stolen property. The Attorney General claims that these circumstances justify our affirming the conviction in count 1, as it carried the greater maximum prison term between the two counts, and our striking the conviction in count 2.

Published authority supports each side's arguments. The defendants rely on *Jasso, supra*, 142 Cal.App.4th 1213, where the Court of Appeal under similar circumstances reversed all the conspiracy convictions. In that matter, the defendant was convicted of three counts of conspiracy to transport controlled substances into prison. (*Id.* at p. 1215.) The trial court did not instruct the jury to determine whether there was one overall conspiracy or multiple conspiracies. (*Ibid.*) The defendant argued instructional error. (*Id.* at p. 1220.) The Court of Appeal agreed and held the error was prejudicial. (*Id.* at p. 1223.) Given the strong evidence that the multiple efforts to smuggle drugs into the prison were part of a single conspiracy rather than three separate counts of conspiracy, it was reasonably probable the jury would have convicted the defendant of a single conspiracy had it been instructed correctly. (*Ibid.*)

The *Jasso* defendant claimed that the evidence established only one conspiracy as a matter of law, and he asked the court to simply strike two of his three convictions. (*Jasso, supra*, 142 Cal.App.4th at p. 1223.) The court declined, and it reversed all three convictions. It explained, "Defendant does not contend that there is insufficient evidence to support the jury's verdict. Moreover, this is not a case where, for example, a single act is the basis for two counts of conspiracy. (E.g., *People v. Patrick* [(1981)]

31

126 Cal.App.3d 952 [single act of kidnapping cannot support separate conspiracy convictions for kidnapping and false imprisonment].) We simply find that the jury should have been directed to decide the factual issue that would have been posed by the omitted instruction." (*Jasso,* at p. 1223.)

The Attorney General relies on *Kopp, supra*, 38 Cal.App.5th 47 (review granted), and *Patrick, supra*, 126 Cal.App.3d 952, to argue we may reverse one but not both conspiracy convictions. In *Kopp*, the jury convicted the defendants of conspiracy to commit murder and conspiracy to dissuade a witness to ensure that two key witnesses did not testify against one of the defendants at trial. (*Kopp,* at p. 55, review granted.) The trial court did not instruct the jury to determine whether there were one or two conspiracies. (*Id*. at p. 80, review granted.) The defendants argued instructional error. (*Ibid*., review granted.) The Attorney General argued there was no error because the evidence did not support an alternate finding of a single conspiracy. (*Id*. at p. 85, review granted.)

The Court of Appeal not only disagreed with the Attorney General, it concluded the evidence of a single conspiracy was stronger in its case than it was in *Jasso*. (*Kopp, supra*, 38 Cal.App.5th at p. 87, review granted.) With evidence of only one conspiracy, the court struck one of the two conspiracy counts. It explained, "Considering the record before us, especially considering the prosecutor's closing argument, the evidence of the conspiracies, and the alleged overt acts, this seems to be one of those unique cases wherein it is apparent that *only* one conspiracy existed. Thus, a properly instructed jury would have only found the existence of a single conspiracy." (*Id*. at p. 88, italics added, review granted.)

In *Patrick*, the jury convicted the defendant of kidnapping, false imprisonment, and two separate conspiracies to commit those crimes. (*Patrick, supra*, 126 Cal.App.3d at p. 965.) The Court of Appeal struck the false imprisonment conviction, as that offense was a lesser included offense of kidnapping. (*Ibid*.) But the defendant also argued

32

instructional error, that the offense of conspiracy to commit false imprisonment had to be stricken because the jury was not instructed to distinguish between the two conspiracies. (*Ibid*.) The Court of Appeal agreed. It stated, "[T]he instructions given to the jury allowed them to convict Patrick of two conspiracy offenses based on exactly the same conduct. The indictment charging the two conspiracies alleged the same 15 overt acts for each conspiracy. The jury was not instructed that a single agreement to commit acts which, if completed, would constitute more than one substantive crime, is but a single conspiracy. [Citation.] Accordingly, Patrick's conviction on the charge of conspiring to commit false imprisonment must be stricken." (*Ibid*.)

We conclude that *Kopp* and *Patrick* provide the better precedent. This case was presented to the jury as a single conspiracy. Although the information pleaded two counts of conspiracy, it alleged the same 58 overt acts for each conspiracy. The jury instructions listed the same 56 overt acts for each conspiracy.

During closing argument, the prosecutor argued the defendants were guilty of participating in one conspiracy. Although two conspiracy convictions were charged, the goal of each was the same—steal property to sell it for money. The three defendants "were all part of an ongoing conspiracy to burglarize homes, burglarize students, and steal MacBooks in the city of Davis." The People's theory of the case was "this is a huge conspiracy." "It was like a business. It was a burglary enterprise. Each of them [had] their different roles, but they were all involved in a conspiracy to commit burglary."

Significantly, defendants concede the evidence supports only one conspiracy conviction for each defendant. Thus, like the *Kopp* court, considering the prosecutor's closing argument, the alleged overt acts, and the evidence of the conspiracies, we conclude that one, but only one, conspiracy existed. A properly instructed jury would have found the existence of only a single conspiracy. (*See Kopp, supra*, 38 Cal.App.5th at p. 88, review granted.) In that circumstance, the proper remedy is to dismiss one of the two conspiracies.

Givens argues that *Kopp* and *Patrick* are distinguishable from this case.  The *Kopp* court held that the evidence before it precluded a finding of two separate conspiracies.  The case was not one where a defendant " 'formed separate confederations with various parties at different times for different transactions.' " (*Kopp, supra*, 38 Cal.App.5th at p. 86, review granted, quoting *People v. Meneses, supra*, 165 Cal.App.4th at p. 1671.)

Givens contends that unlike in *Kopp*, the evidence in this matter does not necessarily preclude a jury from finding more than one conspiracy.  The jury could determine that Hernandez formed a separate conspiracy with Bradford for receiving stolen property and another separate conspiracy not involving Bradford for committing residential burglaries in Davis.  Hernandez could have formed a conspiracy with Kwon to burgle dorm rooms at UC Davis in which Givens and Bradford were not involved.  Or he could have formed a conspiracy with Kwon and "Dane" to fence stolen property in the Bay Area without Bradford's or Givens's involvement.  Givens argues that, like in *Jasso*, the fact the jury could have reasonably concluded there was one overall conspiracy did not prevent the jury from deciding otherwise.  Thus, both of the conspiracy convictions should be reversed so the jury can make the factual decision the omitted instruction would have directed it to make.

Givens's argument notwithstanding, all the parties agree that had the jury been instructed correctly to determine whether there was one conspiracy of committing burglary to get property to sell for money or more than one conspiracy, the jury would have found there was only one conspiracy.  A proper instruction would have correctly defined the one conspiracy as including burglary and receipt of stolen property.  Moreover, the evidence in the record supports the existence of only one conspiracy.  Thus, unlike in *Jasso*, this case is one of those unique cases like *Kopp* where only one conspiracy existed.  The jury would have found the existence of only one conspiracy had it been instructed properly.  Whether Hernandez could have formed a conspiracy with other persons is of no moment; the issue tried was whether there was a conspiracy

34

between the three defendants.  Because the defendants would have been found guilty of only one conspiracy and not two had the jury been instructed correctly, they must be sentenced for the one conspiracy.

Givens contends we also should not rely on *Patrick* because, as the *Jasso* court stated, *Patrick* involved only a single act of kidnapping that could not be used to support separate conspiracy convictions for kidnapping and false imprisonment.  (*Jasso, supra*, 142 Cal.App.4th at p. 1223.)  We respectfully disagree with the *Jasso* court's and defendants' understanding of *Patrick*.  A conviction of an underlying crime is not an element of the crime of conspiracy.

"A conspiracy exists where two or more people agree to commit a crime, they specifically intend both to agree and to commit the crime, and one of them performs an overt act in furtherance of their agreement.  (§§ 182, subd. (a)(1), 184.)"  (*Kopp, supra*, 38 Cal.App.5th at p. 83, review granted.)  The overt act need not be the crime agreed upon or even a criminal attempt.  (*People v. Marquez* (1994) 28 Cal.App.4th 1315, 1325-1326.)  Because the "essence of the crime of conspiracy is the agreement, . . . it is the number of the agreements (not the number of the victims *or number of statutes violated*) that determine[s] the number of the conspiracies."  (*People v. Meneses, supra*, 165 Cal.App.4th at p. 1669, italics added.)

The conviction in *Patrick* for conspiracy to commit false imprisonment was not reversed because the kidnapping conviction could not support two conspiracy counts.  It was reversed because it was based on the same 15 overt acts charged and established for the kidnapping conspiracy conviction.  (*Patrick, supra*, 126 Cal.App.3d at p. 965.)  Indeed, the defendant's conviction of kidnapping or any substantive crime in the action was not necessary to support either of the conspiracy claims.  The identical 15 overt acts were alleged for both conspiracy claims, and the evidence established that both conspiracy claims were based on one agreement.  The jury, however, was not instructed

35

that a single agreement is but a single conspiracy. Hence, the second conspiracy claim was reversed. (*Ibid.*) The case's reasoning and remedy mirror the issues before us.

Having concluded the proper remedy is to reverse one of the two conspiracy convictions, we must determine which one to reverse. The Attorney General contends that because a correctly instructed jury would have found defendants guilty of one conspiracy to commit burglary and receive stolen property, we should prescribe the sentence for the felony which has the greater maximum term, as required by section 182. Under section 182, when two or more persons conspire "to commit two or more felonies which have different punishments and the commission of those felonies constitute but one offense of conspiracy, the penalty shall be that prescribed for the felony which has the greater maximum term." (§ 182, subd. (a).)

The defendants contend they should be punished for the conspiracy conviction that was most commensurate with their individual conduct. Givens argues he should be sentenced for conspiracy to commit burglary, and Bradford claims he should be sentenced for conspiracy to receive stolen property. Defendants rely on *People v. Rojas* (2015) 237 Cal.App.4th 1298, a sex offense case that did not involve a conspiracy. The *Rojas* court stated that continuous sexual abuse in violation of section 288.5, subdivision (a), and any discrete sexual offense committed against the same victim within the same time period must be charged in the alternative; a defendant may be convicted of either offense, but not both. (*Id.* at p. 1308.) Where dual convictions occur, one must be vacated. There is authority that in that circumstance, the court will leave standing the conviction of the offense that is most commensurate with the defendant's culpability, which is usually the conviction that results in the greater penalty. (*Id.* at pp. 1308-1309.)

We agree with the Attorney General. Had the jury been correctly instructed, there would have been only one conspiracy conviction to commit two or more felonies. In that circumstance, section 182 requires that the defendants be sentenced to the term prescribed for the felony that has the greater maximum term. *Rojas* does not apply here

as it concerned alternative charges, not a single conviction of conspiring to commit two or more felonies, a conviction whose sentence is set by statute.

Burglary has a greater maximum term than receiving stolen property. The maximum term for first degree burglary is six years, while the maximum term for receipt of stolen property is three years. (§§ 461; 496, subd. (a); 1170, subd. (h)(1).) We thus will affirm defendants' convictions on count 1, conspiracy to commit burglary, and reverse their convictions on count 2, conspiracy to commit receipt of stolen property. Furthermore, because we affirm the convictions on count 1, Bradford's and Givens's burglary convictions based on vicarious liability are also affirmed.

III

*Sufficiency of Evidence for Hernandez's Conviction on Count 5*

Hernandez contends that insufficient evidence supports his conviction of first-degree burglary under count 5 for burgling the residence at 831 Anderson Road. Recall that the victim, Rui, testified that after she returned home from attending class the morning of July 11, 2013, she discovered that her 13-inch silver MacBook Pro laptop and her camera were missing. Cell phone evidence indicated that Hernandez's cell phone migrated toward the area of 831 Anderson at approximately 10:35 a.m. The day after the burglary, pictures of a silver MacBook Pro laptop appeared on Hernandez's iPhone. Hernandez texted pictures of the laptop from his phone as he tried to exchange it for marijuana.

Rui testified that her MacBook looked exactly like the MacBook depicted on Hernandez's phone, except that in those photos and unlike her MacBook, the MacBook's camera was covered by a piece of paper. Rui also did not recognize the log-in page on the laptop photographed on Hernandez's phone. It did not look like the log-in page that appeared when she turned on her MacBook. The log-in page from the laptop on

37

Hernandez's phone appeared when something was stolen and the person used Find my iPhone or Find my iMac apps to locate it. Rui did not have or use such an app.

To prove Hernandez committed first degree burglary, the prosecution had to establish that Hernandez (1) entered into a structure that was then being used for dwelling purposes (2) with the intent to commit a theft or felony. (*People v. Anderson* (2009) 47 Cal.4th 92, 101.) "[P]ossession of recently stolen property by itself is not sufficient to support a finding of guilt of *any* offense—including theft-related offenses—and, accordingly, there must be other corroborating evidence of the defendant's guilt." (*People v. Moore* (2011) 51 Cal.4th 1104, 1130.) For theft-related offenses, the corroboration need only be slight. (*Id.* at p. 1131.)

Substantial evidence does not support Hernandez's conviction. There was no evidence from which the jury could conclude beyond a reasonable doubt that the MacBook laptop depicted on Hernandez's phone was Rui's stolen laptop. The evidence shows only that Hernandez's cell phone migrated to the vicinity of 831 Anderson the morning of July 11, 2013, during the time Rui was away from the house. Rui's laptop was taken from the house, and the day after the burglary, photos of a MacBook Pro laptop that had a log-in page that did not match Rui's laptop appeared on Hernandez's cell phone to be exchanged. Rui did not have or use the app that would have displayed the log-in page that appeared on the laptop on Hernandez's phone. Since there is no evidence to determine that the displayed laptop was Rui's stolen laptop, a rational juror could not reasonably infer beyond a reasonable doubt that Hernandez entered the dwelling at 831 Anderson with the intent to steal.

The Attorney General speculates the log-in page on the laptop depicted on Hernandez's phone plausibly could have resulted from Hernandez's unsuccessful login attempts or other efforts to prepare the laptop for sale. There is no evidence in the record supporting the assertion. We will reverse Hernandez's conviction on count 5.

IV

*Sentencing Issues*

A.      Assembly Bill No. 518

Section 654 prohibits a court from punishing a defendant more than once for the same act or course of conduct.  (*People v. Hestor* (2000) 22 Cal.4th 290, 294.)  Prior to 2022, the statute required that an act or omission punishable in different ways by different statutes be punished under the provision that provided the longest potential term of imprisonment.  (Former § 654, subd. (a).)  Assembly Bill No. 518 (Stats. 2021, ch. 441, § 1 [Assembly Bill 518]) amended section 654 effective January 1, 2022, to grant a court discretion to punish such an act under either of such provisions.  (§ 654, subd. (a).)

Defendants contend that Assembly Bill 518 applies retroactively to them and requires they be resentenced on those counts where the trial court imposed the longest potential term of imprisonment under former section 654.  The Attorney General agrees, as do we.

Assembly Bill 518 applies retroactively to all cases not final when the statute took effect, such as this one.  (*People v. Mani* (2022) 74 Cal.App.5th 343, 379-380.)  We will direct the trial court on remand and resentencing to apply section 654 as amended by Assembly Bill 518.  At resentencing, the trial court may conduct a full resentencing as to all counts as appropriate based on the law and circumstances that apply when resentencing occurs.  (*People v. Buycks* (2018) 5 Cal.5th 857, 893.)

B.      Staying Bradford's sentence on count 22

Bradford contends the trial court violated section 654 by imposing separate punishments for his convictions of first-degree burglary of 502 Oeste Drive in count 21 and receipt of stolen property taken during that burglary in count 22.  He argues that no substantial evidence supports the trial court's implied finding that defendant harbored

more than a single intent or objective for those two counts.  The Attorney General agrees with Bradford.

Whether a course of conduct is divisible and gives rise to more than one act for purposes of section 654 depends on the defendant's intent and objective.  If all the offenses were incident to one objective, the defendant may be punished for any one of those offenses but not for more than one.  (*Neal v. State of California* (1960) 55 Cal.2d 11, 19.)

Substantial evidence does not support a finding that Bradford's vicarious burgling and actual receipt of stolen property from 502 Oeste Drive were incident to more than one objective.  The property stolen in the burglary in count 21, a silver MacBook Pro, was the same property that supported the conviction for receipt of stolen property in count 22.  In both counts, Bradford's intent was to obtain stolen property to sell.  Because his intent was the same, section 654 barred the trial court from executing separate sentences on both counts.  (See *People v. Allen* (1999) 21 Cal.4th 846, 866–867 [affirming burglary and receipt of stolen property convictions and staying punishment for the receipt of property convictions under section 654].)

On remand, we will direct the trial court to stay execution of its sentence on either count 21 or count 22.

C.    Senate Bill No. 1393 as to Hernandez

At the time of sentencing, state law prohibited trial courts from striking a five-year enhancement imposed for a prior serious felony conviction under section 667, subdivision (a)(1).  (§§ 667, subd. (a)(1); 1385, subd. (b).)  Effective January 1, 2019, Senate Bill No. 1393 (Stats. 2018, ch. 1013, §§ 1, 2 [Seante Bill 1393]) deleted those provisions and gave courts discretion to strike or dismiss serious felony prior enhancements.  (§ 1385, subd. (b).)

The trial court imposed a five-year enhancement on Hernandez under section 667, subdivision (a)(1) for a prior serious felony conviction. Hernandez contends Senate Bill 1393 is retroactive, and that we should remand to allow the court to exercise its discretion on whether to impose the enhancement. The Attorney General agrees.

We also agree. Senate Bill 1393 applies retroactively to all cases such as this that were not final when the legislation became effective. (*People v. Jones* (2019) 32 Cal.App.5th 267, 273.) We will remand for the court to consider whether to strike the enhancement.

D.      Senate Bill No. 567 as to Hernandez

When Hernandez was sentenced, section 1170 gave a trial court discretion when sentencing under a statute that specified three possible prison terms to select what it determined was the appropriate term. (Former § 1170, subd. (b).) Effective January 1, 2022, Senate Bill No. 567 (Stats. 2021, ch. 731, § 1.3 [Senate Bill 567]) amended section 1170 to limit the trial court's discretion. As amended, section 1170 requires a trial court to impose a sentence not to exceed the middle term unless "there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).)

In addition, Senate Bill 567 amended section 1170 to further limit a trial court's sentencing discretion when the defendant presented with certain circumstances. Unless the court finds that the aggravating circumstances outweigh the mitigating circumstances such that imposing the lower term would be contrary to the interests of justice, the court must impose the lower term if any of the following circumstances was a contributing factor in the commission of the offense: (1) the defendant had experienced psychological, physical, or childhood trauma; (2) the defendant was a youth at the time of

41

the offense (defined as under the age of 26 years); or (3) the defendant is or was a victim of intimate partner violence or human trafficking. (§ 1170, subd. (b)(6).) Senate Bill 567's amendments to section 1170 apply retroactively to all nonfinal cases. (*People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1109.)

The trial court imposed a sentence on Hernandez that did not comply with Senate Bill 567's requirements. It imposed upper terms based on aggravating factors which had not been found true by the jury or admitted by Hernandez; specifically, that Hernandez was a leader in the crimes, and he engaged in conduct that showed planning, sophistication, and professionalism. (Cal. Rules of Court, rule 4.421(a)(4), (8).) Also, Hernandez was 22 years old when he committed the offenses, and there is evidence he was subject to abuse resulting in childhood trauma. The court made no finding that his youth or history of abuse were a contributing factor to his committing his crimes or that imposing the lower terms would be contrary to the interests of justice.

Defendant contends he is entitled to the ameliorative benefits of Senate Bill 567 and that we must remand for resentencing. The Attorney General agrees. We agree the matter should be remanded for the trial court to determine in the first instance whether defendant should have been sentenced to the lower terms. It is undisputed he was a youth at the time of his crimes. At a minimum, the trial court must determine whether defendant's youth was a contributing factor to his committing the crimes and whether imposing the lower terms would be contrary to the interests of justice.

We need not address the imposition of the upper terms because at resentencing, the trial court may conduct a full resentencing as to all counts as appropriate based on the law and circumstances that apply when resentencing occurs. (*People v. Buycks, supra*, 5 Cal.5th at p. 893.)

42

E. Hernandez's ineligibility for youth offender parole hearing

Hernandez is ineligible for parole consideration as a youthful offender under section 3051 because of his prior strike conviction.  (§ 3051, subd. (h).)  He argues that his exclusion violates his right to equal protection under the federal and state constitutions.  It does not.

To establish a violation of equal protection, Hernandez must show he is similarly situated to other defendants who receive more favorable treatment under section 3051.  (*People v. Foster* (2019) 7 Cal.5th 1202, 1211-1212.)  He must also show there is no rational relationship between the disparity of treatment and a legitimate government purpose.  (*People v. Chatman* (2018) 4 Cal.5th 277, 288-289.)  Hernandez cannot make either showing.

It is well established that youthful offenders with prior strikes are not similarly situated to youthful offenders who have not suffered any prior strikes.  (*People v. Delgado* (2022) 78Cal.App.5th 95, 102; *People v. Wilkes* (2020) 46 Cal.App.5th 1159, 1165-1166.)  Unlike first-time offenders, a person convicted of prior strikes "is a recidivist who has engaged in significant antisocial behavior and who has not benefited from the intervention of the criminal justice system.  He is the prototype of the repeat offender for whom the three strikes legislation was drafted."  (*People v. Cooper* (1996) 43 Cal.App.4th 815, 829.)

Even if the two groups were similarly situated, the Legislature has a legitimate government purpose to punish defendants with prior strikes more harshly.  "The system of imposing greater punishment on *all* persons who commit a felony-grade crime after having committed one or more serious or violent felonies in the past, is rationally related to the legitimate public objective of discouraging recidivism."  (*People v. Kilborn* (1996) 41 Cal.App.4th 1325, 1332.)  A recidivist "presents too great a risk of recidivism to allow the possibility of early parole."  (*People v. Wilkes, supra*, 46 Cal.App.5th at p. 1166.)

Hernandez cites *People v. Edwards* (2019) 34 Cal.App.5th 183 as authority for holding the different treatment unconstitutional. That case does not apply. In *Edwards*, the Court of Appeal held the statutory exclusion of youth offenders sentenced under the "One Strike" law from the youth offender parole consideration violated equal protection. (*Id.* at p. 199.) The court found no rational basis for excluding One Strike defendants convicted of crimes short of homicide when first-time murderers were not excluded. (*Id.* at pp. 196-197.) The case does not address recidivism as a rational purpose for the distinction here. Indeed, *Edwards* noted the element of criminal history was not at issue. (*Id*. at p. 199.)

Because the Legislature had a rational basis for excluding recidivist youth offenders such as Hernandez from youth offender parole eligibility, the exclusion does not violate equal protection.

F.     Cruel and unusual punishment

Hernandez claims his 93-year prison sentence violates the Eight Amendment's proscription against cruel and unusual punishment and the California Constitution's counterpart. Because Hernandez is entitled to a full resentencing which may yield a lower sentence, this contention is moot.

DISPOSITION

Defendants' convictions under count 2, conspiracy to receive stolen property, are reversed. Hernandez's conviction under count 5, first degree burglary, is reversed. In all other respects, the judgments are affirmed except that the matter is remanded for a full resentencing as to each defendant on all counts as appropriate based on the law and circumstances that apply when resentencing occurs. As part of resentencing, the trial court shall (1) apply Assembly Bill 518 to each defendant's sentence where it imposed the longest potential term of imprisonment under former section 654; (2) stay execution of its sentence against Bradford on either count 21 or count 22 as required by section 654;

44

(3) consider under Senate Bill 1393 whether to strike Hernandez's enhancement imposed under section 667, subdivision (a)(1); and (4) apply Senate Bill 567 to Hernandez's sentence and determine whether he should be sentenced to the lower term on counts where the court may impose the lower, middle, or upper term.

 

                                                      _____

                                                      HULL, Acting P. J.

We concur:

_____

DUARTE, J.

_____

ASHWORTH, J.*

---

\* Judge of the El Dorado County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.